1   **K&L Gates LLP**
    10100 Santa Monica Boulevard
2   Eighth Floor
    Los Angeles, California 90067
3   Telephone: 310.552.5000
    Facsimile: 310.552.5001
4   Christina N. Goodrich (SBN 261722)
    christina.goodrich@klgates.com
5   Ryan Q. Keech (SBN 280306)
    ryan.keech@klgates.com
6   Zachary T. Timm (SBN 316564)
    zach.timm@klgates.com
7   Katherine M. Ramos (SBN 351481)
    katy.ramos@klgates.com
8
    *Attorneys for Plaintiff*
9   *CITIZENS BUSINESS BANK*

10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13

14   CITIZENS BUSINESS BANK, a California    Case No.:  5:22-cv-01473-FLA-SP
     banking corporation,
15                                           [Assigned to the Hon. Fernando L.
                                             Aenlle-Rocha]
16              Plaintiff,
                                             **DECLARATION OF MICHAEL D. STAIN**
17        v.                                 **IN SUPPORT OF PLAINTIFF CITIZENS**
                                             **BUSINESS BANK'S OPPOSITION TO**
18   MISSION BANK, a California corporation, *et al.*,  **DEFENDANT MISSION BANK'S**
                                             **MOTION FOR SUMMARY JUDGMENT**
19              Defendant.
                                             Date:        August 30, 2024
20                                           Time:        1:30 p.m.
                                             Courtroom:   6B
21
                                             Trial Date:  November 12, 2024
22

23

24

25

26

27

28

_____

                    **DECLARATION OF MICHAEL D. STAIN**

# **DECLARATION OF MICHAEL D. STAIN**

I, Michael D. Stain, declare as follows:

1.      I am Senior Vice President of the Central Valley Region of Citizens Business Bank ("CBB" or "Plaintiff"), Plaintiff in the above captioned lawsuit against Mission Bank ("Mission" or "Defendant").  I have personal knowledge of the facts set forth herein and could testify competently thereto if called upon to do so.  I am familiar with CBB's practice for storing and maintaining its business records in the ordinary course of business, including thse records discussed in (and attached to) this declaration, which I have reviewed.  All references to CBB on or after the date of its acquisition of Suncrest Bank (January 7, 2022), include Suncrest Bank ("Suncrest") as it was merged into CBB.

2.      On May 16, 2024, I was deposed in this action in both my individual capacity and as a corporate designee for Plaintiff on certain identified and negotiated topics pursuant to Federal Rule of Civil Procedure 30(b)(6).  A true and correct copy of the email identifying the topics on which I was designated to testify, subject to objections and narrowing, is attached as an Exhibit to the Declaration of Zachary Timm.  During my deposition, Plaintiff's counsel who defended my deposition confirmed that I was designated on these topics and articulated limits to the scope.  Copies of pages from the transcript of my deposition are attached as an Exhibit to the Declaration of Zachary Timm.

3.      I began working for CBB in 2013.  I currently serve as Senior Vice President and Regional Manager of CBB's Central Valley Region and lead a team of Commercial Banking Professionals.  My duties include designing and implementing strategic plans to meet CBB's business goals, managing cross-sell ratios and account retention within teams, developing new business, providing coaching and education to Private Bankers and Managers, and recruiting and developing team members.  I supervised Dustin Della ("Della") from the time he began working at CBB through his resignation on March 15, 2022.

4.    Through my position at CBB, I am familiar with CBB's business practices and business records, which are maintained in the ordinary course of business in CBB's files.    Such records include employment agreements and personnel documents, confidentiality agreements, Associate Handbook (including Code of Conduct), email correspondence, customer information (including pipeline data, forecast information, loan[1] terms and rate information, PPP loan customer data, deposit regular and promotional pricing data, banking history and other compilations of customer information), loan policies and procedures, Credit Memos (as discussed below), and other related information.    Such records include the CBB documents discussed in, and attached to, this Declaration.

5.    I have over forty years experience in the banking industry.    My background in banking includes commercial, agribusiness, real estate lending, and private banking. I studied business administration, finance, and marketing at Duquesne University, and business at Fresno Pacific University.    After graduating from Fresno Pacific University, I began working for Bank of America in August 1981 as an Assistant Vice President, a position that I held until August 1988.    I then began working at Westinghouse Credit Corporation, where I served as a Portfolio Manager until February 1992.    Following this, I worked at PNC Bank as an Assistant Vice President through June 1994.    Thereafter, I began working at Bank of America as a Vice President until September 2002.    I then worked at Wells Fargo Bank as a Senior Vice President, where I served as Senior Director of Banking for Northern California in the Wells Fargo Wealth Management Group, until I began working at CBB in 2013.

6.    Based on this experience in the banking industry, and my specific experience at CBB, I have a strong understanding of the banking industry, especially in California.    In my experience, banks maintain trade secrets that often consist of confidential and proprietary customer compilation information, which they use to service their customers and compete in the marketplace.    I understand that Mission's

---

[1] For ease of reference, I use the term "loan" in this declaration to include all credit facilities including secured and unsecured loans and lines of credit.

2

DECLARATION OF MICHAEL D. STAIN

Handbook is consistent with this understanding in that it expressly states that Mission's employees are prohibited from disclosing its confidential and trade secret information outside of Mission and even states that Mission's trade secrets include the same types of documents and information that CBB contends are Trade Secrets in this case, such as pipeline information and customer lists.  *See* Timm Decl. Ex. 60.

7.    In July 2021, CBB announced an agreement to acquire Suncrest.  That acquisition closed on January 7, 2022, with CBB acquiring all of Suncrest's property and assets, including all physical property, intellectual property, and confidential and proprietary data and documents.  As discussed in the Declaration of my CBB colleague, Daniel Limon, CBB paid a significant premium for Suncrest as compared to its tangible per share book value.    This premium was merited due to, *inter alia*, Suncrest's strong loan and deposit portfolio, goodwill with customers, and Suncrest's trade secrets it utilized to service its customers and remain competitive in the market.  Those trade secrets are discussed below, but include the confidential customer compilation data on loan and deposit customers (including credit memos, Suncrest Loan Policy, and the data found in the PPP list, Promo Rate Report, and pipeline reports).  Those trade secrets were housed in Suncrest's password protected internal systems and were migrated to CBB's password protected internal systems as part of the acquisition, including to CBB's internal Navigator system.

8.    As I testified during my deposition (at pages 130-131), once CBB announced it was acquiring Suncrest,

**DECLARATION OF MICHAEL D. STAIN**

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ███████████.

7    9.    Also during this time, Della was informed about CBB's processes and

8 procedures, as well as its products.  Once the acquisition closed, Della was tasked with

9 helping lead and guide the other former Suncrest employees on these new processes and

10 procedures, as well as the new and different products CBB offered.  He did not.  But this

11 was not just a failure to follow CBB's policies and procedures—though, as CBB's

12 President and CEO, David Brager, stated in his deposition at page 58, Della did have a

13 problem following policies and procedures.  Della's failures in this instance were

14 because he had instead focused his efforts into recruiting those same employees to go

15 work for Mission, which was for the benefit of, and directed and/or encouraged by,

16 Mission.

17    10.    Several of the Former CBB Employees have stated in their declarations that

18 CBB did not provide any support to help the former Suncrest employees acclimate to

19 CBB (*see* Brett Declaration, ¶ 13; Hopper Declaration, ¶ 10), or that CBB was not

20 interested in retaining Suncrest's customers (*see* Brett Declaration, ¶ 14; Dempsie

21 Declaration, ¶ 10.).  Both are false.  First, as noted above, CBB tasked Della with leading

22 the other former Suncrest employees and gave him the tools to do so.  But CBB provided

23 training to the Former CBB Employees, too.  And in particular, training about the

24 conversion from Suncrest's systems to CBB's, as well as the new products CBB could

25 offer compared to Suncrest (and how to help customers pick the best products for their

26 specific needs, including to minimize charges and fees).  As seen in Exhibit 208 to the

27 Declaration of Catherine Owens, there was an All Hands-On-Deck Call and numerous

28 training documents and information provided.  This information included an express

directive that "We want to retain every client we can," and a line item for walking customers through the new products CBB could offer (and discuss options to help customers avoid charges/fees).

11.    As part of its acquisition of Suncrest, CBB offered employment to certain of Suncrest's employees.  This included, *inter alia*, Dustin Della ("Della"), Lori Carabay ("Carabay"), Angie Dempsie ("Dempsie"), Dave Brett ("Brett"), Dianis Pimentel ("Pimentel"), Jorge Espinoza ("Espinoza"), Ericka Melo ("Melo"), Virginia Hopper ("Hopper"), Armidelia Avila ("Avila"), and Patricia Palacios ("Palacios") (collectively referred to in this declaration as the "Former CBB Employees").  These offer letters included that, as of the closing of CBB's acquisition of Suncrest, the Former CBB Employees would be provided a specifically named position, and included certain terms of such employment.  These Offer Letters also made clear that the offer of employment were expressly dependent on, and subject to, the Former CBB Employees remaining in good standing at all times under Suncrest's employment policies and procedures, passing a CBB background check, and executing and agreeing to CBB's pre-employment documents and agreements, which included CBB's Confidentiality Agreement and Handbook (both of which are discussed below).  Della executed his offer letter on September 28, 2021.  Carabay executed her offer letter on September 21, 2021.  Dempsie executed her offer letter on September 20, 2021.  Brett executed his offer letter on September 20, 2021.  Pimentel executed her offer letter on September 27, 2021.  Espinoza executed his offer letter on September 21, 2021.  Melo executed her offer letter on September 20, 2021.  Hopper executed her offer letter on September 21, 2021.  Avila executed her offer letter on September 24, 2021.  Palacios executed her offer letter on September 20, 2021.  Attached hereto as **Exhibit A** are true and correct copies of the aforementioned executed offer letters, which CBB maintains as part of its ordinary business records.

12.    As a further part of offering then-Suncrest employees employment, CBB offered several of the Former CBB Employees it viewed as "key employees of Suncrest"

retention incentives in the form of a "Retention Incentive Program." This incentive was offered pursuant to certain conditions, including that the employee remained a full-time employee for a specific "Retention Period," and that the employee was required to remain in full compliance with the terms and conditions of the letter, as well as CBB's policies and procedures, which include the Confidentiality Agreements and Handbook (containing its Code of Conduct). Della executed this Retention Incentive Program letter on September 28, 2021. Avila executed this Retention Incentive Program letter on September 24, 2021. Brett executed this Retention Incentive Program letter on September 20, 2021. Espinoza executed this Retention Incentive Program letter on September 21, 2021. Attached hereto as **Exhibit B** are true and correct copies of the aforementioned executed Retention Incentive Program letters, which CBB maintains as part of its ordinary business records.

13.    Prior to beginning their employment with CBB, each of the Former CBB Employees was also presented with, and executed, an Employee Agreement Concerning Confidential Information ("Confidentiality Agreement"). The Confidentiality Agreements included that the Former CBB Employees would be provided with certain CBB confidential information as part of their job. The Confidentiality Agreements further specified that this confidential information belonged solely and exclusively to CBB (and that the Former CBB Employees had no ownership in the same), that the Former CBB Employees would maintain this confidential information in strict confidence (including that they would not disclose such information), and that they would promptly return all such confidential information to CBB when their employment relationship with CBB ended. Della executed his Confidentiality Agreement on January 10, 2022. Carabay executed her Confidentiality Agreement on January 10, 2022. Dempsie executed her Confidentiality Agreement on January 10, 2022. Brett executed his Confidentiality Agreement on February 22, 2022. Pimentel executed her Confidentiality Agreement on February 16, 2022. Espinoza executed his Confidentiality Agreement on January 13, 2022. Melo executed her Confidentiality Agreement on

**DECLARATION OF MICHAEL D. STAIN**

January 12, 2022.  Hopper executed her Confidentiality Agreement on January 10, 2022.  Avila executed her Confidentiality Agreement on January 14, 2022.  Palacios executed her Confidentiality Agreement on January 10, 2022.  Attached hereto as **Exhibit C** are true and correct copies of the aforementioned executed Confidentiality Agreements, which CBB maintains as part of its ordinary business records.

14.     As a further part of their employment, the Former CBB Employees each also acknowledged and agreed to be bound by the terms of CBB's Associate Handbook (which includes CBB's code of personal and business conduct and ethics, and its whistleblower policy).  Attached hereto as **Exhibit D** is a true and correct copy of CBB's Associate Handbook, which CBB maintains as part of its ordinary business records.  Through the Associate Handbook, the Former CBB Employees each further acknowledged the confidentiality obligations they owed to CBB (and that such obligations continued after their employment with CBB ended).  Della acknowledged the Associate Handbook on January 10, 2022.  Carabay acknowledged the Associate Handbook on January 7, 2022.  Dempsie acknowledged the Associate Handbook on January 10, 2022.  Brett acknowledged the Associate Handbook on January 11, 2022.  Espinoza acknowledged the Associate Handbook on January 13, 2022.  Melo acknowledged the Associate Handbook on January 12, 2022.  Hopper acknowledged the Associate Handbook on January 10, 2022.  Avila acknowledged the Associate Handbook on February 16, 2022.  Palacios acknowledged the Associate Handbook on January 7, 2022.  Attached hereto as **Exhibit E** are true and correct copies of the aforementioned policy acknowledgments, which CBB maintains as part of its ordinary business records.

15.     Della and Brett were recognized as key employees and offered Restricted Stock pursuant to CVB Financial Corp.'s (CBB's parent company) 2018 Equity Incentive Plan.  Attached hereto as **Exhibit F** are true and correct copies of the offerings under CVB's 2018 Equity Incentive Plan made to Della and Brett, which CBB maintains as part of its ordinary business records.

7

**DECLARATION OF MICHAEL D. STAIN**

16.    In addition to the contracts CBB entered into with its employees, CBB also entered into valid contracts with each of its business banking customers. These agreements included, *inter alia*, escrow agreements, promissory notes, credit agreements, deposit agreements (including Business Deposit Accounts Master Agreements), Commercial Security Agreements, and Corporate Resolution to Borrow/Grant Collateral. These agreements also include the arrangement by which CBB (formerly Suncrest) engaged in business with these customers, which necessarily assumed compliance with applicable laws and banking regulations, including those specifically requiring CBB to maintain the confidentiality of its customers' financial information. Della was well aware of these agreements and his obligations to keep customer information private and not disclose outside the bank, including the customer's own documents (which CBB does not allege are its trade secrets).

17.    CBB's (including former Suncrest's) business banking customers have included: ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

18.    Additional CBB customers and prospective customers (including those of former Suncrest) include: ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1

2

3

4 ████████.

5     19.    Further CBB customers and prospective customers (including those of

6 former Suncrest) also include: ████████████████████████

7

8 ██████████.

9     20.    Given my position and oversight of CBB's Central Valley Region, I am

10 familiar with the branches in that region, including the development and operations of

11 those branches. This includes the region in which Della and the Former CBB Employees

12 worked.

13     21.    When CBB acquired Suncrest as described above, it also acquired

14 Suncrest's Trade Secrets.

15     22.    CBB's Trade Secrets (which includes Suncrest's Trade Secrets) can be

16 broken into three categories. The following documents, information, and testimony are

17 treated as confidential and proprietary by CBB (including Suncrest) and include and

18 reflect CBB's trade secret information (and that of former Suncrest) at issue in this

19 action, and are collectively referred to throughout this Declaration as "CBB's Trade

20 Secrets" (or just "Trade Secrets"). To the extent that any of the documents, information,

21 and testimony below is determined by the Court to not constitute a trade secret, it is still

22 nonetheless CBB's confidential and proprietary information that Della and the other

23 Former CBB Employees were obligated under their CBB contracts and policies, as well

24 as applicable laws and regulations, not to share, disclose, or use for any purpose other

25 than for their work for CBB.

26         a. As discussed in more detail in Paragraphs 34-35 below, the first

27             category of CBB's Trade Secrets are compilations of confidential

28             customer information (including financial information). The specific

**DECLARATION OF MICHAEL D. STAIN**

documents and other Trade Secrets within this category include, but are not limited to: Pipeline Reports (**Exhibit G** [DD0000537-538] and **Exhibit H** [MB20583]); a spreadsheet showing PPP loan list (which attached to the Declaration of Catherine Owens at Exhibit 9); a Promo Rate Report (attached to the Declaration of Catherine Owens at Exhibit 10); and other documents showing compilations of customer-specific financial and personal information (including loan rates, terms, deposit pricing, fees, banking history, special requests, key contact information), excerpts of which were secretly sent by Della to Mission in emails from his personal email and in texts—all while he was still working for CBB, as reflected in documents produced by Della and Mission in this action. (**Exhibit J** (DD000224); **Exhibit K (DD000226); Exhibit L** (DD000586); **Exhibit M** (DD0001097); **Exhibit N** (DD0006968); **Exhibit O** (DD0007201); **Exhibit P** (DD0007352); **Exhibit Q** (DD0007042); **Exhibit R** (DD0007324); **Exhibit S** (DD0007414); **Exhibit T** (DD0007541); **Exhibit V** (DD0007998); **Exhibit W** (DD000175)).

b. As discussed in more detail in Paragraphs 45-46 below, the second category of CBB's Trade Secrets are Credit Memos. Several examples of these Credit Memos are attached to the Declaration of Catherine Owens at Exhibits 12, 105-106, 109, 111, 112, 136, 137, 138, and 147. Additional examples of these Credit Memos (which Mission and Della produced in this action) are attached to the Declaration of Zachary Timm. An additional Credit Memo is attached hereto as **Exhibit I**. Della and Mission produced numerous documents in this action that show that Della secretly sent these Credit Memos to his personal email address (in violation of bank policies and agreements) and then sent them to Mission—all while still working at CBB and telling me that he

**DECLARATION OF MICHAEL D. STAIN**

was trying to close deals with these customers.  I later found out, including through this litigation, that he was lying because he and Mission produced documents showing that he was actually sabotaging those deals at CBB and secretly diverting them to Mission.

c.  As discussed in more detail in Paragraphs 51-52 below, the third category of CBB's Trade Secrets are Policies and Procedures.  The specific documents and other Trade Secrets within this category include, but are not limited to: the Suncrest Bank Loan Policy (the "Loan Policy") (which is attached to the Declaration of Catherine Owens at Exhibit 65(b)), and which Della secretly sent to his personal email address (in violation of policies and procedures) and then sent to Mission, in response to their request that he "smuggle" it out of CBB— all while still working at CBB, as shown in documents that Della and Mission produced in this case.

23.    CBB's Trade Secrets as set forth above (and further described below) consist of: (1) information; (2) that is valuable because it is unknown to others; and (3) is maintained confidentially by CBB (including through the use of credentialed access and password protections, as well as confidentiality obligations imposed on all of CBB's employees, including those hired from Suncrest).

24.    CBB spent years and substantial resources in developing the Trade Secrets it created, and I understand that Suncrest did the same for the Trade Secrets that it developed.  CBB then spent a substantial amount of time reviewing and considering its acquisition of Suncrest, including evaluating the Trade Secrets Suncrest possessed. CBB paid a premium to acquire Suncrest (and its Trade Secrets), thus becoming the owner of the Trade Secrets Suncrest created.  These documents and other information have value in being unknown to others, both because of the great effort it has taken to acquire and compile such information, but also because of the value that it would have

to a competitor who could then avoid those same expenses by simply stealing information from CBB.

25.    Moreover, CBB's Trade Secrets represent, and demonstrate, how CBB conducts business.  Specifically, and collectively, they identify the specific customers CBB has, the customers CBB is evaluating, the specific deals and loans CBB is considering offering, the manner in which CBB is evaluating those customers, deals, and loans, *and* CBB's actual final evaluation thereof.  In essence, the Trade Secrets in this Action represent CBB's loan offerings from start to finish: its playbook for offering loans.  If any one of these Trade Secrets is disclosed to a competitor, it gives that competitor valuable insight into a specific stage of CBB's loan process, allowing that competitor to create a responsive gameplan to counter CBB's ability to compete in the market.  If all of the Trade Secrets are disclosed to a single competitor (as they have been to Mission), that competitor is granted CBB's entire playbook, and enables that competitor to specifically design and tailor its one business to cut CBB out of the market and steal business from CBB (without the risks associated with competing for business).

26.    CBB maintains this information (including the Trade Secrets it acquired from Suncrest), as confidential and takes multiple steps to do so.  As further discussed in this declaration and the Declaration of Steven Cashiola, CBB utilizes confidentiality agreements (and confidentiality provisions found in other agreements, such as the Associate Handbook), electronic passwords, restrictions on access to information, physical security, electronic monitoring of activity to search for exfiltration of data, and other means.

27.    CBB's customers may have access to the information they provide to CBB, as well as certain account-related information that CBB, in turn, provides back to the customer.  This includes, for example, bank statements, loan terms, and related agreements.  CBB does not argue that its bank statements or its customers' own financial documents like tax returns and profit and loss statements are trade secrets in this action.  Those documents, however, are required to be treated as confidential under applicable

**DECLARATION OF MICHAEL D. STAIN**

law, regulations, and CBB's agreements and policies with its employees.  CBB does not provide its customers access to CBB's own compilations of customer data, including such compilations found in the PPP list, Promo Rate Reports, pipeline reports, or the confidential compilation data stored in Navigator.  CBB does not provide its customers access to CBB's internal systems (which remain credentialed and password protected, including unique user-defined access restrictions).  CBB's internal systems compile information pertaining to *all* of CBB's customers, including in ways to make that data easily accessible and usable *by CBB employees* to better service CBB's customers, track and solicit future business, and overall work for CBB's benefit.

28.    CBB does not provide its customers with any data pertaining to any of CBB's *other* customers.  Moreover, CBB *does not* provide its customers with any of its Trade Secrets discussed above, nor does CBB provide this information to anyone else outside of the bank, nor are they publicly available.  This includes, for example, that CBB *does not* provide a customer with the Credit Memo pertaining to that customer.  In fact, CBB actually further restricts access to its Trade Secrets even within the bank, as not all employees have access to the same information, but rather have access to information they need to know/use to perform their job duties on behalf of CBB.  Suncrest similarly protected this data as required under applicable banking laws and regulations because, for example, I know that its data was migrated from its internal password protected systems to CBB's internal password protected systems.

29.    As part of their employment with CBB, Della and the other Former CBB Employees were granted access to certain confidential and trade secret information (including CBB's Trade Secrets).  Specifically, Della had access to, and did access, each of the three categories of CBB's Trade Secrets as identified in Paragraph 22 above.  The information contained in CBB's Trade Secrets was (and is) confidential, and CBB's employees who received them (including Della and the other Former CBB Employees) knew not to distribute them outside the bank.  These documents were also covered by Della's and the other Former CBB Employees' confidentiality obligations in their

13

**DECLARATION OF MICHAEL D. STAIN**

agreements referenced in this Declaration and that of Mr. Cashiola, which required them to keep all bank data confidential.  They also knew that these documents had independent economic value by virtue of being confidential given that they had detailed financial information that would be valuable to a competitor to use to unfairly compete with CBB because it would enable a competitor to avoid the time and expense of contacting customers and using other sources to obtain this information, which customers are often not willing to share with a bank with whom they do not currently have accounts or transactions.  Other banks also do not have access to a customer's historical banking information with other banks (including account/transaction size, credit history, rates/pricing, fee structure, etc.) without first establishing a relationship with that customer, which can take weeks to years to do.  Other banks also do not have access to a bank's internal analysis of its transactions with customers, which reflect the bank's confidential and proprietary assessment of the transaction under its loan policy.

30.    Not only does possession of these documents allow a competitor to avoid expenses, but, more importantly and as discussed above, it also provides that competitor with CBB's playbook as to how it conducts business.  For example, it provides a competitor with CBB's playbook as to its loan processes (and specifically how it is approaching a specific loan for a specific customer).  If a competitor knows what customers CBB is pursuing, the product offerings those specific customers are interested in, the terms on which the product would be/is being offered, the policies and procedures CBB uses to evaluate a potential piece of business, *and* the end analysis prepared pursuant to those policies and procedures, that competitor (in this case Mission) completely undercuts and negates fair competition, and is able to specifically tailor its offerings and procedures to directly undercut CBB.  This is particularly harmful as to *new* customers with no pre-existing relationship with the bank (as Mission did not have with CBB's customers), because the competitor can then present their products and offerings in a manner that they already know the customer will accept and create a false impression of being intrinsically competitive, as opposed to the truth: that the competitor

**DECLARATION OF MICHAEL D. STAIN**

(Mission) is already in possession of all of that customer's information and knowledge of how CBB evaluated the business and what CBB was prepared to offer, and has carefully tailored its presentation pursuant thereto.

31.    CBB maintains its Trade Secrets (along with its other confidential and proprietary information that may not necessarily be a Trade Secret such as customer bank statements, appraisal reports, environmental reports, and similar types of documents) in and on its confidential and password protected systems, including, but not limited to, CBB's core system.  CBB employees must be provided with certain authorized credentials by CBB to view its confidential documents in its core computer system.  CBB further protects its Trade Secrets through monitoring of large downloads or printing of information from CBB's core systems, locking USB drives so they cannot be used to transfer information to personal, non-work devices, and monitoring emails that are flagged by trigger words.  These protections were all in place during all of 2021, 2022, and up through the present.  As discussed herein, Suncrest similarly protected its data throughout 2021 and 2022, up through the acquisition.

32.    Moreover, as discussed above, CBB further protects its Trade Secrets through the use of numerous contractual obligations imposed upon, and agreed to by, CBB's employees.  This begins with the offer letters (Exhibit A) and Retention Incentive Program (Exhibit B), and expands to include the Confidentiality Agreements (which specify CBB's confidential information belongs solely to CBB, and requires its employees to maintain this information (which includes CBB's Trade Secrets) in strict confidence and prohibits disclosure of the same) (Exhibit C).  Further contractual confidentiality obligations are found in the Associate Handbook (Exhibits D & E) and, in the case of Della and Brett, the Equity Plan (Exhibit F).

33.    Based on my decades of experience in the banking industry, my knowledge of banks servicing commercial clients, and my specific experience with CBB, it is my opinion that CBB's Trade Secrets are highly valuable to competitor banks such as Mission.  CBB's Trade Secrets, such as Credit Memos and the Loan Policy work hand-

in-hand to provide a comprehensive picture of CBB's lending decisions.  Disclosure of such information to a competitor (like Mission) would allow that competitor to quickly identify potential loans it was interested in *without* going through its own analysis and identification of such opportunities, and with confidence in the thoroughness of CBB's analysis of the opportunity.  Similarly, compilations of customer information (such as the PPP Loan Report, Promo Rate Report, and Pipeline Report) contain confidential information about what types of accounts a given customer has with CBB (and on what terms), as well as what types of *new* accounts that customer is looking to open.  This information is compiled by CBB in order to track its customer accounts and to identify new potential business, including ensuring new business is followed-up on and eventually closed by CBB.  Disclosure of this information would, again, allow a competitor such as Mission to gain an unfair advantage by quickly identifying potential new business without undertaking any efforts.  By using CBB's Trade Secrets, Mission would instantly and effortlessly benefit from the years of resources and development that CBB (and Suncrest) invested into developing its relationships with clients to obtain, create, and compile this information, without ever having to undertake similar efforts.

34.    The first category of CBB's Trade Secrets that Della and the other Former CBB Employees had access to, and did access, is compilations of customer information (including excerpts thereof).  This information includes large amounts of data on CBB's current, former, and prospective customers, which CBB (and Suncrest) had acquired, compiled, maintained, updated, and used over the course of many years.  This includes compilations of data such as ███████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████.  This information was maintained in CBB's password-protected systems, including CBB's core banking system, and is barred from disclosure outside of CBB (including that it is subject to the confidentiality agreements and provisions binding Della and the other Former CBB Employees).  This information is highly valuable to CBB, as it allows

DECLARATION OF MICHAEL D. STAIN

CBB to better service its customers, as well as better offer its services to prospective customers. Disclosure of this information to a competitor would cause substantial financial and competitive harm, as it would allow that competitor to target solicitation efforts at specific customers based on CBB's history and knowledge of those customers.

35. Upon my review of CBB's ordinary business records, the specific documents and information within this category include a compilation of PPP loans issued by Suncrest, which is attached to the Declaration of Catherine Owens as Exhibit 9. This compilation included information on 664 bank customers, *inter alia*, ███████████████████████████████████████████████ . This list was compiled from CBB's password-protected systems, and Della (and other CBB employees) only had access to it because he worked at CBB and had agreed to keep such information confidential and would only use it for his work at CBB. This list is not publicly-available nor is all of the data provided in the list. Based on my review of emails and other documents produced by Defendants, Della obtained this complete list of PPP loans *after* he had already discussed joining Mission (and in fact after he had received his official offer letter to do so). This compilation was not shared with anyone outside of CBB (including that it would not be shared with the customers, even those included on the list). Della knew this compilation, and the data comprising it, was confidential and was not to be shared outside of CBB, including because his agreements and obligations owed to CBB precluded him from doing so. Della further knew this compilation had independent economic value by virtue of being confidential given that it had detailed financial (and contact) information that would be valuable to a competitor (like Mission), including because it would allow a competitor to specifically target CBB's customers based on confidential information CBB had compiled, and otherwise unfairly compete with CBB.

36. Della did not have a legitimate business purpose to request this *entire* PPP loan sheet when he did in February 2022, and he had no reason to access the same as

17

part of his job duties for CBB. Della was not permitted to print this PPP list from CBB's system for distribution outside CBB. I did not ask Della to acquire, use, or print this list nor am I aware of anyone else at CBB who did so. It is highly unusual that Della requested and obtained this list given the large volume of data and that it included many customers with whom Della had no prior contact or relationship. Della's position at CBB did not involve managing PPP loans for the entire group of CBB (former Suncrest) customers who obtained such loans. Della knew this. Della also knew that he could not send such a list to himself at his personal email address, but he testified that he could not recall if refrained from doing so, suggesting that he did send this list to his personal email address while working at CBB in violation of CBB's agreements and policies, as well as applicable banking law and regulations.

37. Della requested and acquired the entire PPP portfolio *after* discussing his impending move to Mission with Mission's executives, and *after* Della already had an offer letter from Mission.

38. Upon my review of CBB's ordinary business records, the specific documents and information within this first category also included a "Promo Rate Report," which is attached to the Declaration of Catherine Owens as Exhibit 10. This document was an additional compilation of information, including ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. This information was not publicly available and was housed on CBB's password-protected systems, and Della only had access to it because he worked at CBB and had agreed to keep such information confidential and would only use it for his work at CBB. This compilation was not shared with anyone outside of CBB (including that it would not be shared with the customers, even those included on the list) under CBB's agreements and policies, as well as applicable banking laws and regulations. Della knew this compilation, and the data comprising it, was confidential and was not to be shared

**DECLARATION OF MICHAEL D. STAIN**

outside of CBB, including because his agreements and obligations owed to CBB precluded him from doing so.  Della further knew this compilation had independent economic value by virtue of being confidential given that it had detailed financial (and contact) information that would be valuable to a competitor (like Mission), including because it would allow a competitor to specifically target CBB's customers based on confidential information CBB had compiled, and otherwise unfairly compete with CBB.

39.    Della did not have a legitimate business purpose to request or access this Promo Rate Report when he did in February 2022, and he had no reason to access it as part of his job duties for CBB—and the fact he had requested it shortly after discussing promo rates with Easterly via text message is all the more suspicious.  (*See* Timm Decl., Ex.126 (DD0006968).)  Moreover, I never asked him to access this document, nor am I aware of anyone else at CBB asking him to.  Nonetheless, Della requested the entire Promo Rate Report *after* discussing his impending move to Mission with Mission's executives, and *after* Della already had an offer letter from Mission.

40.    Upon my review of CBB's ordinary business records, the specific documents and information within this first category also included Pipeline Reports. The Pipeline Report is a compilation of CBB's customers' information, including, *inter alia*, ███████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████.  This information was not publicly available and was housed on CBB's password-protected systems, and Della only had access to it because he worked at CBB and had agreed to keep such information confidential and would only use it for his work at CBB.  This compilation was not shared with anyone outside of CBB (including that it would not be shared with the customers, even those included on the list) under CBB's agreements and policies, as well as applicable banking laws and regulations.  Della knew this compilation, and the data comprising it, was confidential and was not to be shared outside of CBB, including

DECLARATION OF MICHAEL D. STAIN

because his agreements and obligations owed to CBB precluded him from doing so. Della further knew this compilation had independent economic value by virtue of being confidential given that it had detailed financial (and contact) information that would be valuable to a competitor (like Mission), including because it would allow a competitor to specifically target CBB's customers based on confidential information CBB had compiled, and otherwise unfairly compete with CBB.  Given my interactions with Della and the amount of detailed information on the Pipeline Report, it is not believable that Della memorized the detailed information in the Pipeline Report as, in my experience, Della does not have an exceptional memory nor is he particularly detail-oriented.  The report includes customer data that Della only had access to as part of his work for CBB and was under an obligation to use only for work at CBB and was based on data that he acquired for use at CBB (formerly Suncrest).  I have never given Della permission to use his access to CBB's data and customers so as to move those customers to another bank, including Mission.  I am not aware of anyone at CBB who did so.  Indeed, such an arrangement is highly improper and I have never seen it in my over 40 years in banking.  A true and correct copy of one such Pipeline Report is attached hereto as **Exhibit G**, which CBB maintains as part of its ordinary business records.

41.    Despite the confidential nature of this Pipeline Report, Della sent it to Bryan Easterly—Mission Bank's Chief Banking Officer—on March 7, 2022, while Della was still employed by CBB.  Della's email to Easterly makes clear that Della was sending this to Mission to provide Mission with specific customers and deals to "to go get"—deals that, again, CBB had expended significant resources to pursue, track, and begin to process.  CBB desired, and expected, to close these loans, which Della knew and reiterated in internal communications at CBB. CBB did not reject any of the transactions on the Pipeline Report.  CBB never gave Della permission to share any of the information (that he obtained from customers and CBB) that is on the Pipeline Report with anyone outside of CBB, including Mission nor am I aware of any permission given to Della by CBB to obtain information from customers for Mission, while Della was still

working at CBB.  CBB did not know that Della was working for Mission and sending customer data and CBB data to Mission while he was still working at CBB.  I was shocked to learn that he had done so.  Moreover, as Della even admits in his Declaration at Paragraph 25, Mission continued to use and update this document after Della joined Mission.

42.    Upon review of certain documents produced by Della and Mission in this action, it is apparent that Della was also providing Mission with similar information to that discussed above in emails and text messages.  Specifically, Della would send correspondence to Mission's executives with information about a specific customer and specific deal, or several customers in a single correspondence.  These communications— sent while Della was still working for CBB—would include property details and terms, and other customer-specific information.  This information, just as the other compilations of customer data discussed above, were not publicly available and were housed on CBB's password-protected systems (and formerly Suncrest's password protected systems), which Della only had access to because he worked at CBB and had agreed to keep such information confidential and would only use it for his work at CBB. Many examples of these communications are attached to the Declaration of Zachary Timm, and they clearly demonstrate Mission using Della as an "inside man" at CBB to obtain information about CBB and its customers (including CBB's Trade Secrets) and then use that information to solicit those same customers.

43.    These customer and deal-specific lists and pieces of information were not shared with anyone outside of CBB (including that it would not be shared with the customers, even those included on the list) under CBB's agreements and policies, as well as applicable banking laws and regulations.  Della knew this information was confidential and was not to be shared outside of CBB, including because his agreements and obligations owed to CBB precluded him from doing so.  Della further knew this compilation had independent economic value by virtue of being confidential given that it had detailed financial (and often contact) information that would be valuable to a

**DECLARATION OF MICHAEL D. STAIN**

competitor (like Mission), including because it would allow a competitor to specifically target CBB's customers based on confidential information CBB had compiled, and otherwise unfairly compete with CBB.

44.    I have never given Della permission to use his access to CBB's data and customers so as to move those customers to another bank, including Mission. I am not aware of anyone at CBB who did so. Indeed, such an arrangement is highly improper and I have never seen it in my over 40 years in banking. True and correct copies of many of these communications are attached hereto as (**Exhibit J** (DD000224); **Exhibit K (DD000226); Exhibit L** (DD000586); **Exhibit M** (DD0001097);   **Exhibit N** (DD0006968);   **Exhibit O** (DD0007201); **Exhibit P** (DD0007352); **Exhibit Q** (DD0007042); **Exhibit R** (DD0007324); **Exhibit S** (DD0007414); **Exhibit T** (DD0007541); **Exhibit U** (DD0007549); **Exhibit V** (DD0007998); **Exhibit W** (DD000175)).

45.    The second category of CBB's Trade Secrets that Della and the other Former CBB Employees had access to, and did access was CBB's Credit Memos. Credit Memos represent a bank's full analysis of a particular transaction. This analysis is proprietary, performed by bank employees, and lays out every last detail about a loan including ███████████████████████████████████████████ ████████████████████. Credit Memos also summarize a customer's history and debts with the bank. Credit Memos are prepared pursuant to, and informed by, the underlying Loan Policy. All of this is equally true of the Credit Memos from Suncrest and the Suncrest Loan Policy, which CBB acquired as part of the Suncrest acquisition.

46.    Credit Memos are not publicly available and are housed on CBB's password-protected systems, and Della only had access to it because he worked at CBB and had agreed to keep such information confidential and would only use it for his work at CBB. Credit Memos are not shared with anyone outside of CBB (including that they are not even shared with the customer to whom they pertain). Della knew Credit Memos are confidential and were not to be shared outside of CBB, including because his

**DECLARATION OF MICHAEL D. STAIN**

agreements and obligations owed to CBB precluded him from doing so.  Della further knew Credit Memos had independent economic value by virtue of being confidential given that it had detailed financial (and contact) information that would be valuable to a competitor (like Mission), including because it would allow a competitor to specifically target CBB's customers based on confidential information CBB had compiled, and a comprehensive analysis CBB had performed, and otherwise unfairly compete with CBB.  Attached hereto as **Exhibit I** is a true and correct copy of one such Credit Memo, which includes handrwritten notes, which CBB maintains as part of its ordinary business records.  Additional examples of Credit Memos were produced by Mission Bank and Della in this Action, and are attached as exhibits to the Declaration of Catherine Owens and Declaration of Zachary Timm.

47.     Despite the extremely confidential nature of Credit Memos, based upon my review of documents produced by Mission in this Action I am aware that Della impermissibly and inappropriately shared *many* Credit Memos with Mission while he was still employed by CBB.  CBB was interested in closing each of the loans at issue in the Credit Memos and had undertaken great time and effort to prepare them (and in some cases had even approved and/or issued loans based upon them).

48.     Della's assertion in paragraph 19 of his declaration that he sent CBB's (formerly Suncrest's) credit memos to Mission bank—without CBB's knowledge or consent, and in direct violation of his contractual and policy obligations to CBB as set for in Exhibits A-F of this Declaration—as to "pending transactions" because he wanted to help the customer find a home for the specific transaction at issue is false on its face and defies reason.  Della admits that these transactions were pending at CBB, so it was a breach of his duty of loyalty and his obligations to advocate for its customers or prospects to use another bank for those transactions.  Della does not identify any specific customers and related Credit Memos that CBB declined and even if he did, he still would not have been permitted to send CBB's Trade Secret Credit Memos outside of CBB without CBB's knowledge or permission.  Neither Suncrest nor CBB shared their Credit

Memos with their customers. These are internal bank documents, each of which shows the terms on which CBB (and former Suncrest) would engage in the transaction with the customer. Della only had access to these Credit Memos by virtue of his role at CBB and on the condition that he maintain them as confidential. Della agreed in his contracts with CBB and as per its policies that he would not send this information outside the bank, especially to CBB's competitors. Della was not permitted to engage in "self help" by taking it upon himself to decide that he was going to "help the customer find a home for the specific transaction at issue" by sending CBB's Trade Secret Credit Memos (and other information) to CBB's competitor. Moreover, in one of the emails to which Della attached a Credit Memo, he said he was sending the Credit Memo to Congdon "as we discussed," showing that Della and Congdon had discussions, the result of which was Della agreeing to send Mission CBB's Credit Memos. (*See* Timm Decl., Ex. 73 (DD00000029).)

49.    This is made all the worse because of what Della was telling between the time CBB acquired Suncrest and Della left CBB to join Mission. Della was tasked with informing CBB's customers of the new and different products CBB offered compared to Suncrest (or help the other former Suncrest employees CBB hired to inform those customers of the same). Della led me to believe he was doing just that, and even would inform me about the various deals he was working up and pursuing on CBB's behalf. As discussed furth in this declaration, those deals did not close. I was shocked and upset to learn that Della was not actually pursuing these deals on CBB's behalf, but instead was diverting them to Mission.

50.    Della's assertion in paragraph 19 that he was still encouraging customers to stay at CBB but offering to help them move business if CBB would not "entertain" a particular transaction also violated Della's contractual and other obligations to CBB. Della has not identified any specific customer or specific Credit Memo as to which CBB has declined to engage in a transaction and received my permission as his supervisor at CBB and CBB's General Counsel's permission to send CBB's Trade Secret Credit

Memos or any other related data to CBB's competitors, including Mission (this is required under the Associate Handbook (*see, e.g.,* Exhibit D at p. 17, § D). Also, I did not deny any of the transactions that are on CBB's damages analysis spreadsheets attached to the Declaration of CBB. CBB wanted these transactions and that is why they are included on the spreadsheet. For any transaction that CBB did not want to pursue, it was not included on in CBB's damages analysis. I know this because I reviewed documents regarding the customers that CBB believed left to go to Mission because of Mission's and Della's conduct supporting its federal and state claims in this case. I had internal discussions about which customers and transactions to include and which to exclude, based on (among other things) whether CBB was pursuing that business and would have closed that business, but for Mission's misappropriation of trade secrets, interference with contractual and business relationships, and unfair competition.

51.    The third category of CBB's Trade Secrets that Della and the other Former CBB Employees had access to, and did access was CBB's loan policies and procedures, and related information. This information represents the "keys to the kingdom" in terms of how CBB (including former Suncrest) approaches and structures loans, interacts with its customers, and otherwise does business. CBB's loan policies and related information are non-public and maintained confidentially on CBB's password-protected systems. These documents and information are not shared outside of CBB, and are not shared with CBB's customers. Della knew the loan policies and procedures, and related information were (and are) confidential and were not to be shared outside of CBB, including because his agreements and obligations owed to CBB precluded him from doing so. Della further knew the loan policies and procedures and related information had independent economic value by virtue of being confidential given it governed how Suncrest (and CBB) would evaluate and potential loans and determine credit worthiness. Della further knew that disclosure of this information would allow a competitor to specifically target CBB's customers based on confidential information CBB had

**DECLARATION OF MICHAEL D. STAIN**

compiled—especially when used in conjunction with Credit Memos—and otherwise unfairly compete with CBB.

52.    Through my review of CBB's ordinary business records, specific documents that fall within this category include Suncrest's Loan Policy, which CBB acquired as part of its acquisition of Suncrest.  The Suncrest Loan Policy informed and governed the Credit Memos discussed above, and was the governing policy in place when CBB acquired Suncrest.  This Loan Policy is, therefore, intrinsically linked to the Credit Memos and loans at issue in this Action.  Knowledge of, and access to, the Loan Policy allows anyone (in this instance, Mission), to determine the credit-worthiness of a given customer and whether or not they would issue a specific loan on specific terms to that customer.  When combined with a Credit Memo, a competitor (in this case, Mission) would be able to identify specific loans that specific customers were interested in, review how CBB evaluated and analyzed that potential loan, understand the grounds and processes by which CBB evaluated the credit-worthiness of a particular customer for a particular loan, and be confident in the final recommendation and analyses.  A copy of the Loan Policy is attached to the Declaration of Catherine Owens as Exhibit 65B.

53.    Despite the confidential nature of the Loan Policy, Della shared it with Mission while he was still employed by CBB.  In particular, a review of documents produced by Mission in this Action shows that Mission's Chief Banking Officer (Bryan Easterly) and Chief Credit Officer (Michael Congdon) discussed requesting this policy and CBB's debt yield policy from Della.  Easterly then asked Della to "smuggle" him a copy of CBB's loan policy, which Della did in flagrant violation of numerous obligations owed to CBB.

54.    Della's assertion in Paragraph 20 of his Declaration that he did not believe he improperly disclosed the Suncrest Loan Policy to Mission is false.  CBB did not share its loan policies (including the Suncrest Loan Policy) with its competitor banks or anyone outside of the bank.  Easterly's request to Mr. Della that he "smuggle" the Suncrest Loan Policy out of CBB and send to Mission shows that, on its face, both

**DECLARATION OF MICHAEL D. STAIN**

Mission and Della knew that its was improper for Della to send it to Mission.  In my many years of experience in banking, I have never sent my bank's loan policy to its competitor banks and have never heard of anyone at the banks I worked at do so.  I was shocked to learn that Della had done this and that Easterly had requested that he do so.

55.    As noted above, Della also sent Mission numerous Credit Memos.  This conduct allowed Mission to review CBB's proprietary analysis, understand the processes behind that analysis, and quickly determine whether Mission wanted to issue specific loans to specific CBB customers— loans that CBB desired to issue, and in some cases had already approved (and even issued).  For example, in my deposition I testified at page 130 about how I had approved a pricing for a loan to ███████, but Della then sent the Credit Memo for that deal to Mission.

56.    Through my more than four decades of experience in the banking industry, I have come to understand how long certain processes and procedures take.  This includes the average time in which it takes between identifying a potential loan and issuing that same loan.  This process includes collecting large amounts of information from the customer (including, *inter alia*, tax information, financial statements, and other financial information), requesting appraisal reports and reviewing them once they are prepared, evaluating the collateral, reviewing and analyzing the customer's financial picture (including their history with the bank), often times ordering environmental reports, ordering title reports, and more.  This is a lengthy process that

57.    Through my review of CBB's business records and other certain documents produced in this action (including by Mission and Della), I have seen specific examples of Mission executives asking Della for CBB's information (including CBB's Trade Secrets discussed herein), and even more examples of Della sending those same executives CBB's Trade Secrets.  The Trade Secrets (as well as other non-trade secret customer confidential information) Della gave to Mission (including while he was still working for CBB) pertained to CBB's customers.  In many cases, and as further discussed in the declaration of Daniel Limon, many of those customers then

**DECLARATION OF MICHAEL D. STAIN**

subsequently opened those very same accounts with Mission. My understanding is that these customers had *no* preexisting relationships with Mission, but rather those relationships all began *after Mission was given CBB's Trade Secret information including confidential financial information pertaining to those customers.* In my experience and opinion informed by my decades of work in the banking industry, Mission simply would not have been able to solicit away all of these customers from CBB without using the Trade Secret (and other confidential information) Della provided to Mission and brought with him from CBB. And certainly would not have been able to do so in the extremely short period of time following Della's resignation from CBB.

**DECLARATION OF MICHAEL D. STAIN**

58.    Della's and Mission's conduct is the most egregious conduct I have seen in my over four decades within the banking industry.  This conduct included Mission recruiting Della and using him as a corporate spy on their behalf to steal CBB's information while still working at CBB (including it Trade Secrets as discussed in this declaration), and use that stolen information to solicit customers—customers whose information Della impermissibly shared with Mission.  And, in my opinion, both Della and each of the Mission executives knew exactly how improper their conduct was— Easterly even went so far as to expressly use the word "smuggle" when he was asking Della to provide him with CBB's confidential and Trade Secret information.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5 day of August, 2024 in Ontario California.

Michael D. Stain

**DECLARATION OF MICHAEL D. STAIN**