**K&L Gates LLP**
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, California 90067
Telephone: 310.552.5000
Facsimile: 310.552.5001
Christina N. Goodrich (SBN 261722)
christina.goodrich@klgates.com
Ryan Q. Keech (SBN 280306)
ryan.keech@klgates.com
Zachary T. Timm (SBN 316564)
zach.timm@klgates.com
Katy Ramos
katy.ramos@klgates.com

*Attorneys for Plaintiff*
*CITIZENS BUSINESS BANK*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITIZENS BUSINESS BANK, a California banking corporation,<br><br>Plaintiff,<br><br>v.<br><br>MISSION BANK, a California corporation and DOES 1 through 10, inclusive,<br><br>Defendant. | Case No. 5:22-cv-01473-FLA-SP<br><br>**PLAINTIFF CITIZENS BUSINESS BANK'S OPPOSITION TO DEFENDANT MISSION BANK'S MOTION FOR SUMMARY JUDGMENT; DECLARATIONS OF MICHAEL STAIN, STEVEN CASHIOLA, DANIEL LIMON, AND ZACHARY TIMM; RESPONSE TO DEFENDANT'S SEPARATE STATEMENT AND STATEMENT OF ADDITIONAL FACTS; EVIDENTIARY OBJECTIONS; [PROPOSED] ORDER**<br><br>Date: August 30, 2024<br>Time: 1:30 p.m.<br>Courtroom: 6B (First Street Crthse) |

---

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**I.**    **INTRODUCTION** ..................................................................................1

**II.**   **FACTUAL AND PROCEDURAL HISTORY** ......................................3

    **D.**    CBB extended offers to certain key employees, including Della, to work at CBB post-merger on the condition that they protect its Trade Secrets. .....................................................................................7

    **E.**    Della secretly enters into a conspiracy with Mission to steal from CBB, interfere with its relationships, and unfairly compete with CBB. ...............................................................................................8

    **2.**    Mission and Della misappropriate CBB's Trade Secrets, interfere with its relationships, and unfairly compete—all while Della is still at CBB. ...............................................................................................9

    **3.**    Mission and Della divert CBB's customers and prospects to Mission—all while Della is still working for CBB .......................13

    **F.**    CBB discovers Mission's conspiracy and promptly demands it cease. ............................................................................................14

**III.**  **JUDICIAL STANDARD** ...................................................................14

**IV.**   **ARGUMENT** .....................................................................................15

    **A.**    The evidence establishes that CBB has identified protectable Trade Secrets, which Mission misappropriated resulting in damage.......15

    **1.**    CBB has specifically identified Trade Secrets.............................15

    **G.**    CBB's damages are clear and calculated based on Defendant's conduct ..........................................................................................22

    **B.**    The state law claims are not superseded by CUTSA....................23

    **C.**    There are disputed issues of material fact on CBB's state law claims. ...........................................................................................25

**V.**    **CONCLUSION** ..................................................................................**25**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Angelica Textile v. Park*,
  220 Cal. App. 4th 495 (2013), *as modified* (Oct. 29, 2013), *as modified on denial of reh'g* (Nov. 7, 2013) ......................................................24

*Argo v. Pro.*,
  2013 WL 11327772 (C.D. Cal. Dec. 6, 2013)...............................................16, 17

*Barlow v. Ground*,
  943 F.2d 1132 (9th Cir. 1991) ......................................................................14, 17

*Brain Inj. Ass'n of California v. Yari*,
  2020 WL 3643482 (C.D. Cal. Apr. 30, 2020) .....................................................16

*ClearOne v. Chiang*,
  2007 WL 4376125 (D. Utah Dec. 13, 2007) ........................................................24

*Copart v. Sparta*,
  277 F. Supp. 3d 1127 (E.D. Cal. 2017) ...............................................................24

*Courtesy v. Camacho*,
  222 Cal. App. 3d 1278 (1990) ..............................................................................17

*Extreme v. Spotgenie*,
  2013 WL 12081182 (C.D. Cal. Nov. 22, 2013) ...................................................16

*Gray v. Golden*,
  866 F.Supp.2d 1129 (N.D. Cal. 2011)..................................................................23

*Harvest v. Mitnick*,
  2024 WL 694372 (C.D. Cal. Jan. 23, 2024)...................................................15, 16

*Henry v. Cook*,
  191 F. Supp. 3d 1072 (N.D. Cal. 2016)................................................................16

*Hernandez v. Creative Concepts*,
  295 F.R.D. 500 (D. Nev. 2013) ............................................................................23

*Imax v. Cinema*,
  152 F.3d 1161 (9th Cir. 1998) ..............................................................................15

*Kwikset v. Sup Ct,*
   51 Cal. 4th 310 (2011) ........................................................24

*Lies v. Farrell Lines,*
   641 F.2d 765 (9th Cir. 1981) ...........................................15, 17, 18, 19

*Loop AI Labs v. Gatti,*
   2015 WL 5158461 (N.D. Cal. Sept. 2, 2015) .........................24

*Morlife v. Perry,*
   56 Cal. App. 4th 1514 (1997) ....................................16, 17

*Race Winning v. Gearhart,*
   2023 WL 4681539 (C.D. Cal. Apr. 21, 2023) ......................24

*Ridgel v. U.S.,*
   2013 WL 2237884 (C.D. Cal. May 21, 2013) ......................14

*Silvaco v,. Intel,*
   184 Cal. App. 4th 210 (2010) ....................................24

*Sun Distrib. v. Corbett,*
   2018 WL 4951966 (S.D. Cal. Oct. 12, 2018) .....................16, 17

*Swarmify v. Cloudflare,*
   2018 WL 1609379 (N.D. Cal. Apr. 3, 2018) ......................24

*US v. Nosal,*
   844 F.3d 1024 (9th Cir. 2016) ....................................16

*Wanke, Indus. v. Keck,*
   209 Cal. App. 4th 1151 (2012) ..................................17, 19

*X6D v. Li-Tek,*
   2012 WL 12952726 ...............................................15

*Zahler v. Columbia Pictures,*
   180 Cal. App. 2d 582 (1960) ....................................21

*Zendel v. Circle Locations,*
   2013 WL 12111752 (C.D. Cal. July 19, 2013) ..................14

**Statutes**

15 U.S.C.A. § 6801 ....................................................13, 14, 25

**TABLES OF CONTENTS AND AUTHORITIES**

Cal. Civ. Code § 3426.7(b)(1) .............................................................................23, 24

**TABLES OF CONTENTS AND AUTHORITIES**

# I. __INTRODUCTION__

Mission's Motion is as misguided as it is myopic.[1] Far from demonstrating that CBB's claims lack merit, Mission's Motion actually *establishes as undisputed* the very facts it states do not exist. And those facts paint a vibrant and disturbing picture of Mission as a desperate bank that ignores customer privacy, bank regulations, ethics, and the law—so greedy to open a Visalia branch with a quick (albeit illegal) route to success, that they were willing to do anything to make it happen. Despite Mission's unpersuasive arguments to the contrary, one thing is clear:  there are genuine disputes of material fact on all issues challenged in the Motion. Thus, Mission's Motion fails.

CBB acquired Suncrest in January 2022. In doing so, it acquired all of its Trade Secrets, data/files, and property—it also hired certain Suncrest employees, including Della and the Former CBB Employees. Two months later, in March 2022, Della and the Former CBB Employees abruptly left CBB to join Mission. Immediately thereafter, CBB's customers began closing their accounts with CBB and/or pulled out of deals pending at CBB. Due to the speed at which this happened and based on information from CBB's customers and employees, CBB became concerned that Mission and Della had stolen CBB's Trade Secrets and interfered with relationships.

On March 25, 2022, CBB's General Counsel sent a letter to Mission (and Della), formally notifying them that CBB believed they had stolen its trade secrets, sabotaged its relationships, and interfered with its business relationships. CBB specifically identified the Trade Secrets it believed were stolen (and related customers) based its investigation to date. CBB also informed Mission of the various agreements between Della and CBB and obligations he (and the Former CBB Employees) owed to CBB, including confidentiality obligations. CBB was concerned that Mission and Della had

---

[1] Suncrest Bank ("Suncrest"); Plaintiff Citizens Business Bank, includes Suncrest beginning on January 7, 2022 (collectively, "CBB"); Defendant Mission Bank ("Mission"); Dustin Della ("Della"), collectively with Lori Carabay, Angie Dempsie, Armidelia, Dave Brett, Diania Pimentel, Ericka Melo, Jorge Espinoza, Patricia Palacios, and Virgina Hopper (the "Former CBB Employees").

__MEMORANDUM OF POINTS AND AUTHORITIES__

1  used, and would continue to use, its Trade Secrets, and demanded that they return all of

2  CBB's property, which it repeated during the next 4 months. Mission refused to comply.

3  Instead, it responded with what now appears to be its modus operandi—ignore the facts,

4  boldly proclaim innocence, threaten adverse action, and hope no one notices.  Indeed,

5  Mission ignored facts showing wrongdoing, boldly proclaimed that its investigation

6  established its innocence, made veiled threats as to CBB's own hiring practices, and

7  hoped CBB would not pursue this dispute. CBB was, thus, forced to file this action.[2]

8      It is a good thing it did, as discovery has proven CBB's was right.  Mission's

9  conspiracy was so bold that its executives even expressly asked Della to "smuggle"

10  CBB Trade Secrets to them (which Della happily obliged). Shockingly, much of this

11  evidence was initially withheld by Mission—who asserted it had completed its

12  production in July 2023. In fact, much of the evidence discussed in this Motion was

13  only obtained after CBB issued numerous third-party subpoenas (over unsuccessful

14  motion to quash on the grounds it had already produced all responsive information). It

15  was only after CBB received third-party productions it became obvious that Mission's

16  productions were incomplete. CBB then had to move for a forensic examination in order

17  for Mission to more fully comply with discovery.

18      There is now overwhelming and conclusive evidence of Mission's guilt. For

19  example, Mission produced numerous emails showing during his final months at CBB,

20  Della sent Mission's executives countless Trade Secret Credit Memos, the entire

21  Suncrest Loan Policy, Pipeline data and report, and excerpts from CBB's customer

22  compilation data. Della also produced highly incriminating emails and texts

23  establishing his conspiracy with Mission—all while Della was still working at CBB.

24  Clearly, there are triable issues of material fact. Yet, faced with this overwhelming

25  evidence (evidence that *should have been uncovered during Mission's alleged*

26  *investigation*), Mission's response was to file its Motion, which is yet another example

27

28

[2] Mission has refused to disclose the content of its investigation based on privilege.

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

of its pattern: ignore, proclaim, threaten, and hide. Except this time, Mission is trying to mislead the Court. It will not succeed.

In the end, Mission's Motion last-ditch effort to extricate itself from this case fails miserably. Thus, its Motion must be denied.

## II.    FACTUAL AND PROCEDURAL HISTORY

A. CBB grows over 50 years to become a leading public bank that is recognized for its exceptional customer service and work environment.

Founded in 1974 by a dairy farmer and small business owner who saw a need to support other business owners in his community, CBB has grown to be highly successful and trusted financial institution with approximately $16 billion in assets with 3 trust offices and over 60 banking locations throughout California. (https://www.cbbank.com/about-us/)  CBB's holding company, CVB Financial Corp., has been repeatedly recognized by S&P Global Market Intelligence as one of the best-performing U.S. public banks with assets over $10 billion and by Forbes as among America's Best Banks. *Id.* CBB has also been recognized as one of America's greatest Workplaces for Women by Newsweek and Plant-A insights Group. (*Id.*)

B. As part of CBB's growth, it acquired Suncrest, paying a premium due to Suncrest's strong loan and deposit portfolios, serviced using its Trade Secrets.

CBB announced in July 2021 an agreement to acquire Suncrest, which had 7 branch locations and 2 loan production offices in California's Central Valley. SAF 1-2. That acquisition closed on January 7, 2022, with CBB acquiring all of Suncrest's property and assets, including *inter alia* its physical property, data, policies, credit memos, and intellectual property (including its Trade Secrets). *Id*.

CBB paid a premium for regional-leader Suncrest as compared to its tangible per share book value. *Id.* This premium was merited due to Suncrest's strong loan and deposit portfolios, which in turn are attributable to the deep customer goodwill that Suncrest spent years developing, along with the Trade Secrets used to service its customers and compete in the market, as discussed below. SAF 1. As such, the value of

3

the Trade Secrets at issue in this action can be traced to their value to CBB since acquisition, as well as part of the premium paid for Suncrest, which reflected the substantive resources used to develop and maintain these trade secrets. SAF 2.

  C. <u>CBB's newly acquired Trade Secrets from Suncrest, along with its existing trade secrets, are highly valuable, competitively information.</u>

  CBB protects its Trade Secrets through, *inter alia*, policies and procedures requiring confidentiality; confidentiality agreements; electronic passwords; access on a need-to-know basis; physical security (e.g., key card access); data movement monitoring; and video surveillance. SAF 4. CBB does *not* provide its customers with its Trade Secrets, nor are they disseminated outside the bank. SAF 5.

  The Suncrest's Trade Secrets, together, with CBB's existing trade secrets, constitute the "CBB Trade Secrets" at issue in this action, which are as follows.[3]

  (1) <u>CBB's compilations of customer information (including excerpts thereof):</u> This consists of compilations of data on CBB's current, former, and prospective customers, which CBB (including Suncrest) has acquired, maintained, updated, and used over the course of many years. SAF 6-7. These Trade Secrets consist of:

  a. **Pipeline data and reports**.



  b. **PPP loan data and list**.

---

[3] Due to page limit, CBB's supporting declarations provide further details.

**MEMORANDUM OF POINTS AND AUTHORITIES**

1

2

3

4

5

6

7

8

9 .

10       c.      **Promo rate data and report**.

11

12

13

14

15

16

17

18

19

20

21 .

22       d.      **Other customer compilation data sent by Della to Mission via text or**

23 **email**.

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

1 ███████████████████████████████████████████

2 ███████████████████████████████████████████

3 ███████████████████████████████████████████

4 ████████████████████████████████████████

5     (2)    **CBB's Credit Memos**:█████████████████

6 ███████████████████████████████████████████

7 ███████████████████████████████████████████

8 ███████████████████████████████████████████

9 ███████████████████████████████████████████

10 ███████████████████████████████████████████

11 ███████████████████████████████████████████

12 ███████████████████████████████████████████

13 ███████████████████████████████████████████

14 ███████████████████████████████████████████

15 ███████████████████████████████████████████

16 ███████████████████████████████████████████

17 ███████████████████████████████████████████

18     (3)    **CBB's loan policies and procedures**.████████

19 ███████████████████████████████████████████

20 ███████████████████████████████████████████

21 ███████████████████████████████████████████

22 ███████████████████████████████████████████

23 █████████████████████████████████████████

24 ████████████████████████████████ *Id.*

25       The CBB Trade Secret loan policy at issue in this action is the Suncrest Loan

26 Policy, the CBB Loan Policy, and related procedures. SAF 27. The Suncrest Loan

27 Policy is the main loan policy at issue and there is direct evidence that Mission's Chief

28 Banking Officer ("Easterly') asked Della to "smuggle" copies of the Suncrest Loan

6

Policy to Mission while Della was still working at CBB, which Easterly knew. SAF 28. Della complied. SAF 29. Mission's Chief Credit Officer ("Congdon") asked Della to provide him with CBB's Loan Policy and Debt Yield Policy, while he was still working at CBB. SAF 30. These loan policies are part and parcel of the Credit Memo Trade Secrets because many of those memos were drafted pursuant to the Suncrest Loan Policy. SAF 31. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

### D. CBB extended offers to certain key employees, including Della, to work at CBB post-merger on the condition that they protect its Trade Secrets.

CBB identified key Suncrest employees that it wanted to work at CBB after the merger. SAF 33. As a result, in September 2021, it extended offers to Della and the Former CBB Employees to continue to work at Suncrest (soon to be CBB) after the merger. SAF 34. These offers were contingent on agreeing to certain contractual and legal obligations. The employee contracts and policies at issue in this action are:

**Offer letters**. CBB's offer letters required Della and other employees to remain in good standing under Suncrest's policies and practices and execute all required CBB pre-employment documents and agreements. SAF 35-36.

**Retention incentive program offer letters**. CBB offered Della and other key employees retention incentives on the condition that they agree to certain provisions, including executing the Equity Agreement. SAF 37-38.

**Confidentiality agreement**. CBB required Della and other employees to agree to maintain the confidentiality of its confidential, proprietary, Trade Secret, and customer information, and refrain from customer and employee raiding. SAF 39-40.

**Associate handbook**. CBB required Della and other employees to acknowledge their confidentiality obligations (including post-employment obligations). SAF 41-42.

**Equity agreement**. Della and Brett were further offered restricted stock in CBB's parent company (CVB Financial Corp.) with enhanced obligations. SAF 43.

7

E.  <u>Della secretly enters into a conspiracy with Mission to steal from CBB,
interfere with its relationships, and unfairly compete with CBB.</u>

Mission is a California-based bank that competes with CBB. (Brager Depo. 30:9-18; 70:1-2; https://www.missionbank.bank/who-we-are/our-history). SAF 44. In order to increase its presence in the Central Valley, Mission wanted to open a Visalia branch and targeted Della and other CBB employees to help it do so beginning in 2021. SAF 45. Mission's efforts intensified in late 2021 and early 2022: it soon entered into a conspiracy with Della and other Former CBB Employees to interfere with CBB's customer and employee contracts and relationships, interfere with its prospective business, unfairly complete with CBB, and steal its Trade Secrets. SAF 46. Mission conspired to evade CBB's detection by emailing Della at his personal email address, even though the emails were clearly with a current CBB employee (Della) about CBB's customers and employees. SAF 47. Mission and Della knew this violated applicable law and regulations for a bank employee to send customer financial information outside of the bank without customer (or CBB's) consent. SAF 48. Nonetheless, they continued.

Della met with and regularly communicated with Mission's officers and president in furtherance of this conspiracy, including at a meeting on January 19, 2022 and on February 2, 2022, when Della and Easterly discussed a late March start date at Mission. SAF 49. Mission told Della that any offer to him would "depend on the growth goals and overhead brought in by Dustin" (*id*.) Thus, Della recognized his compensation at Mission would be dependent on the loans and deposits he could divert from CBB to Mission. SAF 50. On February 18, Mission sent an offer letter to Della, which he executed on February 28, 2022. SAF 51.

1.  <u>Mission and Della solicit other CBB employees—all while Della was
still working at CBB.</u>

Mission and Della took further steps in their conspiracy by soliciting a number of *other* CBB employees—all while Della was still working for, being paid by, and owed duties to CBB. SAF 52; SDF 112-130. For example, on February 10, 2022,

**MEMORANDUM OF POINTS AND AUTHORITIES**

Mission expressly stated that it wanted to "begin to meet with them now to start the recruitment/interview process." SDF 111; SAF 49. In fact, on the day Della accepted his offer from Mission, he provided Mission with the name and personal contact information for 7 other CBB employees (including one that neither Mission nor Della contacted and did not want to work for Mission). SAF 112. The evidence shows Della did not have permission from CBB or all of the employees to share this information with Mission. On March 2, Mission sent Della copies of the offer letters for the Former CBB Employees, despite knowing he was still working at CBB. SDF 127-129.

Mission's recruitment of Della and the other employees had three built-in stalls. First, Mission and Della wanted to ensure he received his retention bonus from CBB before abruptly resigning. SAF 114. Second, and more harmful to CBB, Mission and Della used this time to obtain CBB's Trade Secrets and other confidential information (including, *inter alia*, non-trade secret confidential customer information) in order to streamline the setup for its brand new Visalia branch, which had no deposits or loans associated with it when it opened a few weeks after Della joined. SAF 115. Mission's efforts were *highly* successful, resulting in more loans in 90 days upon opening the Visalia branch than Della said would be ███████████████████████ ████████████████████████████████████████████.[4] SAF 116. Finally, Mission and Della used this time to sabotage CBB's customer relationships by delaying responding to customer inquiries, delaying moving forward on customer transactions, blaming CBB and the merger for the delays (which Della and his team actually caused), falsely stating that CBB did not want to do business with some customers, and intentionally canceling certain transaction related items. SDF 126.

> 2. Mission and Della misappropriate CBB's Trade Secrets, interfere with its relationships, and unfairly compete—all while Della is still at CBB.

Throughout this time, Della readily assumed the role of corporate spy, sending

---

[4] Mission had apparently done this before with other banks. SAF 67 (Brager Depo).

**MEMORANDUM OF POINTS AND AUTHORITIES**

Mission *substantial* amounts of CBB information all in furtherance of the conspiracy with Mission to steal CBB's Trade Secrets, interfere with CBB's relationships, and unfairly compete. Della's embrace of Mission's plan to disrupt CBB's business was so obvious that even his own team members recognized that Della wanted "to single-handedly take down CBB." SAF 53. This underlying desire to harm CBB spread through the rest of the employees Mission hired, as seen by their gleeful discussions about how they were "sure [CBB's] reeling right about now trying to anticipate what else is coming." SAF 117. Further evidence of the conspiracy to pilfer CBB's customers is easily seen in a *Mission Bank agenda* for a 5/23/22 meeting, which *refers to many of CBB's customers* and includes a line item to "Call Suncrest clients." SAF 118.

As noted, Della's acts in furtherance of this conspiracy began almost immediately upon meeting with Mission. On January 19, 2022—the ***same day he met with Mission executives***—Della began "smuggling" CBB's documents and information to Mission in the form of Credit Memos. SAF 119. Mission's demonstrably false claims that they did not use this information are easily disproven by their own documents. For example, Mission's executive "used" this data by forwarding the email (and Credit Memo) to Mission's President to "get [his] appetite for putting this memo in front of DLC in the executive session to get comfort in it so I can go back to Dustin and get the buyoff for transferring the relationship to me." SAF 120. Congdon, meanwhile, "used" it by forwarding it to Mission's credit administrator, Stuart Annable. SAF 121.

Della continued to use his personal email address to surreptitiously send CBB's Credit Memos to Mission during the rest of his tenure at CBB. SAF 122. Della sent these Trade Secrets to Mission to determine if Mission would approve the loans when he joined because his compensation would be tied to the Visalia branch's performance. SAF 122; SDF 75. In fact, Della sent Mission these Credit Memos *pursuant to a discussion he had with Mission's CCO* (Congdon) (which clearly disputes Congdon's assertion in his declaration that he had not asked Della to send these Credit Memos). SDF 82; SAF 123. In other words, Della provided Mission a list of customers CBB was

10

**MEMORANDUM OF POINTS AND AUTHORITIES**

doing business with, and the terms of such business (in CBB's Trade Secret documents), to allow Mission to proactively evaluate those relationships and decide if Mission wanted to pursue them *while knowing Della was still employed by CBB* and knowing it violated fundamental and critical banking privacy laws and regulations. *See id.* Mission's own production of emails confirm this: for example, on February 2 Della

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████.

Mission asserts it believed these Credit Memos pertained to loans CBB would not issue. *See, e.g.,* Congdon Decl., ¶ 9. This is false. Mission's and Della's own productions establish that Mission knew that CBB had already approved or was interested in pursuing these transactions. SAF 124. Even Mission's 30(b)(6) designee testified there are *no* other situations where a competitor bank provided Mission with copies of its credit memos for existing or prospective loans. SAF 125.

Mission also stole other Trade Secrets. For example, on February 13, 2022, Della sent Easterly several confidential bank "budgets" as well as a complete printout of Suncrest's Dashboard showing assets, liabilities, and other financial information. SAF 126. Then on March 7, 2022, Della sent Easterly another CBB Trade Secret—"Pipeline Report," discussed above. SAF 10.  On March 18, Della sent more CBB Trade Secret pipeline data to Mission. *Id.* Mission used this Pipeline data as evidenced by its production of modified and updated versions of it. SDF 68.  In another example, Della collected Trade Secret compilation rate information (including specific promo rates offered to specific customers) and sent it to Mission—exchanging texts with Easterly on February 2, 2022, Della and Easterly about the "promo rates" CBB would be offering. SAF 46. Thereafter, on February 11, Della asked for and received CBB's Trade Secret "Promo Rate Report," discussed above. SDF 13. In another example, on February 3, 2022, Della asked another Former CBB Employee for a spreadsheet

11

**MEMORANDUM OF POINTS AND AUTHORITIES**

containing CBB's Trade Secret consisting of its entire portfolio of PPP loan data. SAF 128. He was provided this list but had no legitimate business reason to obtain the *entire* portfolio, which included many customers with whom he had no contact. SDF 14. In another example, following correspondence between Easterly and Congdon on February 17, Mission (Easterly) asked Della that same day to "smuggle a suncrest loan policy and loan procedure" to him. SAF 28. On February 23, Della obliged, sending the Loan Policy to Easterly. SDF 97. Congdon, in turn, forwarded the Loan Policy internally, disproving Congdon's statement that he "never disclosed any portion of the Suncrest loan policy to anyone." SAF 129.  In another example, on March 7, 2022, Della sent Easterly a list of 14 properties with instructions for Mission to ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ recognizing that additional information was needed for each. SAF 131. On March 14, Della responded with completed bid forms and related information, which he had necessarily obtained through his position with CBB. SAF 132.

Della also sent himself additional CBB templates and other forms, enabling Mission's new Visalia branch to skip the time, effort, and cost of developing their own such forms, templates, and processes. SAF 133. Further evidence of Mission using CBB's documents can be seen in June 2022, when Carabay sent a Suncrest form (which she should not have had after resigning) to Mission's Note Department, noting Mission did not have anything similar and asking to use it, which Congdon approved. SAF 134. Della also sent Mission substantial amounts of non-Trade Secret customer information using his personal email address to communicate with Mission. SAF 135.

Della and others at Mission (including, *inter alia*, Congdon) kept CBB's documents and continued to use after Della started working for Mission. For example, on March 18, 2022, Della forwarded CBB templates from his personal email address to his Mission email address, including Loan Process requirements, underwriting

procedures and checklists, and maturity management and portfolio management procedures. SAF 136. He did the same with a term sheet, financial package checklist, and water questionnaire on March 24, 2022. SAF 137. And again on May 13, 2022 with a water resource analysis, budget, and credit memo template and other templates. SAF 138.  In another example of Mission using CBB's information, on April 12, Dempsie informed Carabay that ███████████████████████████████████ for a loan for a CBB customer. SAF 139.

Mission also knew of CBB's restrictions on the dissemination of confidential customer information because the applicable laws and regulations apply to all banks. SAF 140; *see* 17 C.F.R. § 248.10; 15 U.S.C.A. § 6801 (West). It also knew that Della had to remain at CBB for a certain period after the acquisition in order to obtain his retention bonus, which was subject to certain obligations. SAF 141. Mission also knew that it classified its own pipeline and customer information as confidential and trade secret information and barred its employees from sending that information outside of Mission, so it surely knew that CBB's similar information was also confidential and trade secret. SAF 140-141. Mission also knew about *all of CBB's employees'* obligations to CBB because CBB sent the confidentiality agreement and Handbook excerpt to Mission with its March 25, 2022 letter. SAF 140. Nonetheless, Mission closed several loans and opened deposit accounts for CBB customers that Della had sabotaged while working at CBB and as to which Della had sent Mission the customer's private financial non-trade secret data without consent. SAF 142.

       3.   Mission and Della divert CBB's customers and prospects to Mission—
          all while Della is still working for CBB

Mission and Della's conspiracy also included using CBB's Trade Secrets and other data to solicit CBB's customers while Della and others were still at CBB. These efforts began in January 2022, when Della began working with Mission to move CBB's customer accounts from CBB to Mission. SAF 143.  During this time, Mission knew that Della was sabotaging CBB's customers from opening accounts with CBB to help

13

divert them to Mission, in breach of his obligations to CBB.

      F.  <u>CBB discovers Mission's conspiracy and promptly demands it cease.</u>

After Della resigned in mid March 2022, CBB learned of Mission's conspiracy and began an investigation. As discussed above, CBB sent a letter to Mission and Della on March 25, 2022 demanding that they immediately cease using CBB's Trade Secrets and sabotaging and interfering with its relationships. DE 1-1. CBB reiterated this in a subsequent letter sent April 29, 2022. DE 1-2. Thereafter, the parties' communicated but Mission maintained its position that it did not have any of CBB's information and had done nothing wrong. DE 1-3 –1-6.  Discovery in this case has proven Mission's assertions 100% false, including because Mission has now produced substantial evidence demonstrating that *it still possesses* CBB's Trade Secrets. SDF 84.

Stunningly, Mission did not produce these documents until well after it initially represented it had completed its productions in July 2023. DE 77 at 25:7-11. Believing documents were missing from that production, CBB was forced to subpoena numerous third parties, including Della. Only *after* receiving productions from those third parties—which Mission tried to quash on the basis that it had already produced all responsive information those third parties possessed—did CBB confirm that Mission had withheld documents from its production. *Id.*, at § IV.A.1.(a). It was those missing documents that showed the extent of Mission's conspiracy, including Della sending Mission Credit Memos, the Loan Policy, Pipeline Report, and other Trade Secret and non-trade secret customer confidential information. *Id*.

## III.  <u>JUDICIAL STANDARD</u>

A party moving for summary judgment "must show that under the governing law, there can be but one reasonable conclusion as to the verdict." *Ridgel v. U.S.*, 2013 WL 2237884, at *1 (C.D. Cal. May 21, 2013). "[T]he moving party bears a heavy burden of demonstrating the absence of any genuine issue of material fact." *Zendel v. Circle Locations*, 2013 WL 12111752, at *2 (C.D. Cal. July 19, 2013). The court must construe the evidence in light most favorable to the non-movant. *Barlow v. Ground*, 943 F.2d

1132, 1135 (9th Cir. 1991); *Lies v. Farrell Lines*, 641 F.2d 765, 772 (9th Cir. 1981).

## IV.  ARGUMENT

### A.  The evidence establishes that CBB has identified protectable Trade Secrets, which Mission misappropriated resulting in damage.

#### 1.  CBB has specifically identified Trade Secrets.

Mission inexplicably asserts that "CBB has not identified any trade secrets with particularity." Mot. 7:11. Mission then quotes CBB's Complaint—despite this not being a motion to dismiss—before finally referencing CBB's interrogatory responses. *Id.*, at 8:2-10:8. What makes Mission's argument so inexplicable is that ***the Motion specifically identifies and addresses specific documents (and categories of documents) that it states CBB has identified are its Trade Secrets***. *See* Mot. at 13:20-18:16. Thus, Mission's Motion and SUF establish there is a triable issue of fact.

As discussed in detail above and in the concurrently-filed declarations, CBB has repeatedly identified its Trade Secrets at issue in this dispute since March 2022. DE SDF 1-5, 13-15, 44, 58, 62, 71; DE 1 ¶¶12-13, 63-65, 81, 149, 152; *id.* at Exs. 1-6. This continued during pre-filing correspondence and negotiations, and was further detailed in CBB's Complaint, which included descriptions of its Trade Secrets and specifically identified as including customer compilation data, PPP loan data and lists, pipeline data and reports, and promo rate reports. *Id.* CBB has further specified, by name, description, and often Bates number, the specific information and documents that constitute its Trade Secretse, along with evidence of misappropriation, contracts and customers at issue. SDF 1-5, 11, 13-15, 44, 58, 62, 71, 101. Mission readily admits this. *Id.*

Mission, however, relies on distinguishable authority, where the plaintiffs *completely failed* to define their trade secrets with any meaningful specificity.[5] This, CBB has not done. Unlike in the cases Mission cites, CBB *has* identified specific

---

[5] *X6D v. Li-Tek*, 2012 WL 12952726, at *5 (C.D. Cal. Aug. 27, 2012 ( "thousands of bits of trade secret information"); *Imax v. Cinema*, 152 F.3d 1161, 1164-67 (9th Cir. 1998) ("dimensions and tolerances" did not say *what* they were); *Harvest v. Mitnick*, 2024 WL 694372, at *4 (C.D. Cal. Jan. 23, 2024) ("*Pipeline Reports*" are trade secrets).

15

documents it alleges are its Trade Secrets and why they are trade secrets. (SDF 1-5, 13-15, 44, 58, 62, 71.) This includes compilations of customer information (such as PPP information, loan rates, and other terms), Credit Memos, and loan policies. (*Id.*)

>           (1)    Compilations of customer information are protectable.

It is well-settled that customer information can be a protectable trade secret, and indeed "courts have deemed customer lists protectable trade secrets."[6]  "Indeed, courts routinely hold that customer information, developed over a period of years, or relevant customer data, may qualify as trade secrets."[7]

The same is true here. Mission misappropriated customer information *compilations*, including PPP loan data and lists, Promo Rate data and reports, Pipeline data and reports, and excerpts of this data, including in Della's texts and emails to Mission *while working for CBB*. SAF 10, 46, 79, SDF 64. In fact, Mission's own cases admit "Pipeline Reports may constitute a trade secret." *Harvest Small Bus. Fin. v. Mitnick*, 2024 WL 694372, at *6. CBB's other Trade Secrets—Credit Memos, Suncrest Loan Policies, and related information—were *never* shared outside of CBB, including with CBB's Customers. SAF 21, SDF 10, 18. Moreover, **Mission's own Handbook** confirms that Mission treats pipeline information and customer lists as trade secrets and prohibits its own employees from sharing such information outside of Mission. SDF 10.

>           (2)    CBB's customers do not possess CBB's Trade Secrets

Mission's next faulty premise—that CBB's customers have access to their account or transaction information renders such information not protectable—also fails. Courts have repeatedly rejected this misguided argument. For example, in *Sun Distrib.*,

---

[6] *See, e.g., US v. Nosal*, 844 F.3d 1024, 1043 (9th Cir. 2016); *Chartwell*, 2019 WL 2177262, at *6 (customer and employee data protectable); *Sun Distrib. v. Corbett*, 2018 WL 4951966, at *4 (S.D. Cal. Oct. 12, 2018) (customer list protectable); *Henry v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (same); *Extreme v. Spotgenie*, 2013 WL 12081182, at *3 (C.D. Cal. Nov. 22, 2013) (customer list protectable).
[7] *Brain Inj. Ass'n of California v. Yari*, 2020 WL 3643482, at *5 (C.D. Cal. Apr. 30, 2020) (citing *MAI v. Peak*, 991 F.2d 511, 521 (9th Cir. 1993) (customer information protectable); *see Morlife v. Perry*, 56 Cal. App. 4th 1514, 1521 (1997) (same); *Argo v. Pro.*, 2013 WL 11327772, at *3 (C.D. Cal. Dec. 6, 2013) (customer lists protectable).

**MEMORANDUM OF POINTS AND AUTHORITIES**

the court noted that "it is a given that in any case, the customers themselves will have access to their own information," but this fact alone does not mean that such information maintained about the customer cannot be a trade secret. 2018 WL 4951966, at *4. Indeed, the "value to the customer list is in the completeness and details of the list; the fact that each individual customer has access to its own information does not make Plaintiff's list of customers worthless." *Id.* It is undisputed that CBB did not share these compilations with anybody, including customers. SAF 21, 145; SDF 11, 18-19, 52. Moreover, like in *Sun Distrib.*, CBB "has established it used reasonable measures to protect its information from the public."[8] Indeed, "where the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market." *Wanke, Indus. v. Keck*, 209 Cal. App. 4th 1151, 1175 (2012).

        (3)    There is **ample** evidence of misappropriation and resulting harm

Mission's argument that there is no evidence that Mission *used* the CBB Trade Secrets that it requested and received is unpersuasive. Mission relies on self-serving declarations of Mission executives to argue *they* did not use CBB's Trade Secrets and are personally unaware of such use. SAF 146. Setting aside that Della—a Mission executive hired for the purpose of taking CBB business—admits to having used at least some of CBB's Trade Secrets (*see, e.g.,* Della Decl., ¶¶ 24-25), the *documents* and *facts* prove Mission used CBB's Trade Secrets (or at least create a *very* strong inference of use). *See, e.g., Barlow,* 943 F.2d at 1135; *Lies*, 641 F.2d at 772. For example, Congdon asked Easterly to ask Della to "smuggle" the Suncrest Loan Policy out of CBB. SAF 28. Della agreed, emailed the policy to Easterly, who forwarded it to Congdon, who forwarded it to a Mission credit administrator. *Id.* This, alone, is direct evidence of use. And, there are plenty of other examples of Mission's "use." *Id.*

In late January and early February 2022, Della sent a series of CBB Trade Secret

---

[8] *Id*; *see Morlife*, 56 Cal. App. 4th at 1523 (customer list protectable); *Courtesy v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990) (same); Stain Decl. Exs. A-F.

Credit Memos to Mission and admitted that Mission already had CBB's confidential information about these customers' deals, that Mission was pricing the deals and discussing credit and environment risk—all up to three weeks before Mission was introduced to these customers. SAF 143. Della admits that Easterly was looking at

[REDACTED]

**Credit Memos.** It is undisputed that Della sent Mission CBB's Credit Memo's. *See* SDF 11. Della provided these to Mission following, and pursuant to, conversations with Mission's executives, and for the purpose of allowing Mission to evaluate whether it wanted to issue those same loans. *Id.* Mission knew that Credit Memos were confidential, and that receiving them from a competitor was *not* normal nor appropriate, and also knew that it violated federal regulations and other confidentiality obligations Della owed to CBB. *Id.* The transmission of the Credit Memos informed Mission that CBB had approved the loans. *Id.* And, even if Mission claims it thought it was appropriate to receive a competitor's confidential credit analyses for ongoing and potential loans at the time the Credit Memos were sent, it was informed in no uncertain

18

terms on March 25 that CBB *had not* authorized such transmission. (DE 1-1.) Mission has never agreed to return any of CBB's documents that it discovered on its systems nor agreed to forensically destroy all copies, despite multiple pre-suit demands to do so. SDF 84. But reap the benefits Mission has. *Id.*

Mission argues that Credit Memos are not trade secrets because they "were of no value" to Mission, and Mission "did not use them in any capacity to underwrite a loan." (Motion, 18:12-13.) Not so. Mission *did* review these Credit Memos and confirmed to Della that it wanted them. SDF 75. This review allowed Mission to identify "customers with particular needs or characteristics" and Della (and Mission) are therefore prohibited "from using this information to capture a share of the market." *Wanke*, 209 Cal. App. 4th at 1175. That is exactly what Mission did after its review of these Credit Memos: it went out and acquired *the very same* share of the market identified in them.

As a result of Mission's conduct and misappropriation of these Credit Memos, CBB was damaged, and has produced extensive calculations demonstrating such damage. SDFs 101, 130. That Mission may have done its own work *thereafter* is irrelevant—the damage occurred once Mission used CBB's Trade Secrets to confirm the needs of a very specific subset of the market without having to do any of its own work. Moreover, the *speed* at which Mission closed these loans is highly suggestive that Mission *did not*, in fact, do any of its own work. Importantly, Della *sent Mission confidential customer information he only obtained through his position with CBB*. And, Mission has not produced documents showing it actually prepared its own credit memos, much less ones that were materially different from CBB's. Timm Decl. ¶ 132.

The evidence is clear—Mission targeted Della and others to obtain CBB's Trade Secrets and interfere with its relationships so that Mission could get a head start with its new Visalia branch. SAF 133, 145. If Mission did not intend or did not use everything it stole, then why steal it? And how did Mission go from a new Visalia branch with zero deposits and zero loans to $50 million in loans in a few months—it is unheard of and due to Mission's gross misconduct. SAF 116. Thus, there is a disputed material fact.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**Policies and Procedures.** It is undisputed that Mission expressly ***asked*** Della to "smuggle" them copies of the Loan Policy (pursuant to which the Credit Memos were prepared and loans approved). SDF 76; SAF 28. Della obliged. SAF 29. Mission argues this is of no consequence because "CBB never used the Suncrest loan policy," and because "Mission never used or disclosed any portion of the Suncrest loan policy to anyone." Both assertions are inaccurate and misleading. SDF 91-92.

First, the Loan Policy was in place when the above-described Credit Memos were created, and so *was* used in evaluating those loans. SDF 73-75. The fact that these are some of the very loans Mission then solicited demonstrates that the Loan Policy *was* used. Knowledge of this Loan Policy allowed CBB to evaluate its acquisition of Suncrest and allowed Mission to understand the policies and procedures underlying the Credit Memos they stole from CBB (thus confirming their soundness, desirability, terms/pressure points, and Mission's decision to pursue those loans). SDF 73-75.

Second, Mission's documents prove that, after Easterly received the Loan Policy, it was shared with Mission's Chief Credit Officer, Congdon, who shared it with Mission's credit administrator (thus disproving Congdon's statement that he "never disclosed any portion of the Suncrest loan policy to anyone"). *Compare* Congdon Decl.¶ 11, *with* SAF 30. Congdon's assertion that he immediately deleted the policy also raises serious doubts about Mission's compliance with its discovery obligations and the thoroughness of its initial investigation, which necessarily would have revealed these documents. Specifically, Mission was able to readily produce the Loan Policy in discovery without issue, and without claims that it was inaccessible because Congdon had deleted it. Timm Decl. ¶¶2-5. In contrast, Mission asserted strenuous objections to the production of *any* information for which Easterly was the custodian because Mission claimed Easterly had a habit of regularly deleting information. (DE 77, 82, 83.) Eventually (and only after CBB sought forensics), Mission underwent what it described as a lengthy and difficult process to recover the information he deleted. If such a lengthy process was required to recover Easterly's deleted information, it is unclear how

20

Mission was able to readily produce data Congdon now asserts he deleted.

**Compilations of Customer Financial Information.** It is similarly undisputed that Della provided Mission with a CBB Pipeline Report. (SAF 10.) Mission argues that this is not problematic because *Della* created this document, Della only sent it to Easterly (who confusingly states he never looked at it), and that nobody else at Mission ever used the Pipeline Report. Mission's argument fails spectacularly.

Mission's argument is based on the proposition that, because Della created the document while working for CBB (which is undisputed), CBB did *not* create it. Such position appears to posit that for a bank to possess a trade secret, the bank itself (rather than its employees) must create the document. This is obviously nonsensical. Banks can only create things through the actions of their employees. CBB employed Della to work solely for its benefit, not his own and not Mission's. It did so on the condition that he abide by confidentiality obligations. Della only had access to the information used to create these compilation reports by virtue of his employment at CBB. Thus, the reports are CBB's property and Della's continued possession of them violates his contracts with CBB and the law—California law is clear that an employee's work product is the employer's property. *See Zahler v. Columbia Pictures*, 180 Cal. App. 2d 582, 589 (1960) (employee work product is employer's property).

Mission's arguments amount to an assertion that, because Della created a document while at CBB, he is entitled to take that document and continue to use it freely unless *someone else* who worked for Mission prior to Della joining used the document. The law does not allow an employee to take their employer's trade secrets to use at a competitor just because they previously worked on those same documents while employed by the former employer. *Id.* Nor is Della (a Mission Bank executive) allowed to use CBB's Trade Secrets just because he used (or even helped create) them while working for CBB. And, he certainly was not entitled to engage in self-help by disseminating CBB's Trade Secrets to Mission while he was still working at CBB. Once again, Mission's own policies further demonstrate the absurdity of Mission's argument,

21

as Mission prohibits its employees from disclosing its own trade secrets *even after their employment with Mission ends*. SDF 16-17. The same applies to the other compilations.

### G. CBB's damages are clear and calculated based on Defendant's conduct

CBB carefully analyzed *specific* loans (and deposits) it lost due to Mission's conduct. This process looked at the accounts lost to Mission and focused on accounts and customers for which Della sent Mission information. SDF 99. For example, CBB's ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ Credit Memos for these customers, and the Loan Policy on which they were based (allowing Mission to evaluate the Credit Memos for itself), and then decided to pursue these loans. CBB lost these loans and was *directly* harmed by Mission's conduct.

Further, Mission has used (and very likely *continues* to use) CBB's Pipeline data and report to identify and prioritize additional opportunities. For example, Mission has produced versions of the Pipeline data and Report Della provided to Easterly, which have been *updated* since Della joined Mission—unequivocally demonstrating that the Trade Secret is still being used by Mission. SAF 10. Moreover, many of the customers included on the Pipeline Report, PPP loan sheet, Promo Rate Report, and other compilation data Della) have opened accounts with Mission. SAF 147. *None* of these customers had any preexisting relationship with Mission prior to Mission receiving CBB's Trade Secrets. SAF 147. Thus, the clear sequence of events is: (1) CBB customers have no accounts at Mission; (2) Della sends Mission CBB's Trade Secrets *while still at CBB*; (3) Mission opens accounts for those customers shortly thereafter.

CBB's damages are not limited to the misappropriation of its Trade Secrets. Rather, CBB's damages are based on its state law claims discussed below. For example, Mission's acquisition of non-trade secret customer information (including tax returns, profit and loss statements, rent rolls, and other financial information, as well as reports paid for and prepared on behalf of CBB (like environmental, appraisal, and title reports)) also contributed to disrupting CBB's relationships, causing CBB damage.

Mission has also recently provided testimony and a document that identifies, for the first time, certain revenue, profit, and costs on which CBB will seek a disgorgement theory on certain claims. SDF 102-05; SAF 147.

Moreover, Mission acknowledged and *bragged* about the massive amount of business it stole from CBB. This included Della telling members of his team at Mission they had obtained more deposits than would be expected in a good year, and publicly bragging about the same. (SAF 116.)  Mission's own statements reflect that this amount of deposits and loans moving in a short time is unprecedented, and it was only through the use of CBB's Trade Secrets and Mission's conspiracy that it accomplished this. Mission's profits on this amount, therefore, are all the fruits of its conspiracy.

### B. **The state law claims are not superseded by CUTSA.**

Defendant's decision to wait until summary judgment to challenge how CBB *pleaded* its state law claims is inappropriate. It would be fundamentally unfair to reward Defendant for lying in wait until it the eve of trial to assert an argument that CBB could have easily resolved through amendment.[9]  Had Defendant previously raised CUTSA supersession (which it failed to do in its Answer, *see* DE 11), CBB would have clarified the basis of its claims and sought to amend to make clear they are based on facts, other than misappropriation of trade secrets (except where permitted under Cal. Civ. Code § 3426.7(b)(1)). By failing to do so, Defendant deprived CBB of the ability to address this issue in its *pleading*[10] and cannot restrict CBB from doing so now—and so it hereby requests such leave to the extent the Court is inclined to find supersession. But even as pleaded, CBB's claims are not superseded.

CUTSA only supersedes claims that are essentially common law misappropriation of trade secret claims that depend on existence of trade

---

[9] *Hernandez v. Creative Concepts*, 295 F.R.D. 500, 505 (D. Nev. 2013) (cannot plead defense at summary judgment for first time without satisfying Rules 15 and 16).
[10] CBB can conform its pleading to proof and discovery has revealed new facts beyond those in Complaint. *See Gray v. Golden*, 866 F.Supp.2d 1129, 1141 (N.D. Cal. 2011).

23

secret.[11]CUTSA does not displace CBB's contract claims because CUTSA expressly provides that it "does not affect [ ] contractual remedies, whether or not based upon misappropriation of a trade secret." Cal. Civ. Code § 3426.7(b)(1); *Race Winning v. Gearhart*, 2023 WL 4681539, at *7 (C.D. Cal. Apr. 21, 2023) (no supersession). CBB has asserted a tortious interference with contract claim, which is not superseded. *Loop AI Labs v. Gatti*, 2015 WL 5158461, at *3 (N.D. Cal. Sept. 2, 2015) (no supersession).

CBB's state law claims are based on a violation of contracts prohibiting competition while employed at CBB, interference causing breaches of duty of loyalty, as well as unfair competition. DE 1 ¶¶ 229-267. They are also based on interference with CBB's contracts that prohibited employee and customer raiding, disclosure of data that CBB does not claim is a trade secret (like tax returns, customer financial statements, and other customer-provided confidential information), and misuse of company property. DE 1 ¶¶ 229-260. None of this turns on whether a trade secret exists.

CBB further alleges that Mission entered into a conspiracy with Della and others to engage in this, and other, wrongful conduct and that Mission knew of these contracts from Della and others. DE 1 ¶¶ 15–17, 90–93. CBB also sent copies of the confidentiality agreement and portions of the Handbook, noting that all CBB employees agree to their terms. DE 1-1; SDF 124; SAF 73. Mission nonetheless interfered with CBB's relationships, including by working with Della to breach those contracts while he was still at CBB. None of this depends on the existence of a trade secret. The same is true of the employee relationships, whereby Mission conspired with Della to interfere with its employee relationships by acquiring non-public information about those employees from Della, who disclosed it to Mission, so that they could make

---

[11] *Swarmify v. Cloudflare*, 2018 WL 1609379, at *2 (N.D. Cal. Apr. 3, 2018) (no supersession); *Angelica Textile v. Park*, 220 Cal. App. 4th 495, 506 (2013), *as modified* (Oct. 29, 2013), *as modified on denial of reh'g* (Nov. 7, 2013) (no supersession); *Silvaco v. Intel*, 184 Cal. App. 4th 210, 241-242 (2010) (disapproved on other grounds by *Kwikset v. Sup Ct*, 51 Cal. 4th 310 (2011)) (no supersession)*; see also ClearOne v. Chiang*, 2007 WL 4376125, at *4 (D. Utah Dec. 13, 2007) (no supersession); *Copart v. Sparta*, 277 F. Supp. 3d 1127, 1160 (E.D. Cal. 2017) (no supersession).

24

1  employment offers, including to Katrina Puerner who received an unsolicited offer of

2  employment from Mission, which she rejected. SAF 39.

3                     **C. <u>There are disputed issues of material fact on CBB's state law claims.</u>**

4         Mission does not actually set forth sufficient argument to put CBB's state law

5  claims at issue on the merits. Mission does not point to any undisputed material fact

6  that would prevent these claims from reaching a jury. SAF 80, 105-09.Mission

7  interfered with CBB's relationships by obtaining and using its customer's non-Trade

8  Secret private financial documents without CBB's or the customer's knowledge or

9  consent in violation of contracts, policies, and applicable laws and regulations. 17

10 C.F.R. § 248.10; 15 U.S.C.A. § 6801 (West). Mission also conspired with Della to

11 obtain private employment information about CBB's employees so as to raid CBB of

12 those employees (including Puerner)—all while still working at CBB. 17 C.F.R. §

13 248.10; 15 U.S.C.A. § 6801 (West). This, and the facts discussed above, satisfy the

14 UCL's unlawful and unfair prongs. Thus, there is a disputed material fact.

15        As for damages, Mission's attempt to mischaracterize a fact witness's testimony

16 regarding CBB's calculations of its lost profits from the customers lost as a result of

17 Defendant's conduct is legally and factually inappropriate. Mr. Limon was not

18 designated to testify on behalf of CBB as to legal conclusions or analysis. He was

19 designated to testify on behalf of CBB as to the facts underlying CBB's lost profits

20 damages calculations, which were produced months earlier. SDF 98, 101-05, 130.

21 CBB's calculations were based on what was known at the time. *Id.* CBB has discovered

22 additional facts through Mission's 30(b)(6) designee's depositions on damages-related

23 topics (including Mission's revenue) and now has evidence supporting a disgorgement

24 theory. SDF 102-05; SAF 147.

25 **V.**   **<u>CONCLUSION</u>**

26        Mission's Motion is just another example of its misguided strategy of ignore,

27 proclaim, threaten, and hide. There are numerous disputed material facts on each of the

28 issues Mission raises. Thus, its Motion should be denied.

25

**MEMORANDUM OF POINTS AND AUTHORITIES**

1
2
3   Dated:  August 9, 2024
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**K&L GATES LLP**

By: *Connor J. Meggs*
Christina N. Goodrich
Ryan Q. Keech
Zachary T. Timm
Connor J. Meggs
Katherine Ramos

*Attorneys for Plaintiff Citizens Business Bank*

**MEMORANDUM OF POINTS AND AUTHORITIES**