# EXHIBIT 102

CONFIDENTIAL

# LARSON

| **Larson LLP** | 555 South Flower Street, Suite 4400 | **P** 213.436.4888 |
| larsonllp.com | Los Angeles, CA 90071 | **F** 213.623.2000 |

Jonathan E. Phillips
Direct: 213.436.4867
jphillips@larsonllp.com

June 7, 2022

**<u>VIA EMAIL</u>**

Christina N. Goodrich
K&L Gates LLP
10100 Santa Monica Boulevard
8th Floor
Los Angeles, CA 90067
*Christina.Goodrich@klgates.com*

Re:     *Mission Bank and Mr. Dustin Della*

Dear Christina:

I write on behalf of Mission Bank in response to your June 1, 2022 email to me and your May
17, 2022 email to Gary Findley, both of which laid out Citizens Business Bank's ("CBB")
concerns regarding Dustin Della's departure from CBB to Mission Bank. Your June 1 email
specifically raised concerns about (1) whether Mr. Della and his team attempted to sabotage
CBB's pending loan requests for Pepita Real Estate LP, YZAK Investments, and Stor-It
Palmdale; (2) whether Mr. Della and his team have used CBB's property (including confidential
or trade secret information) to solicit CT Homes LLC, A&L Partida, Dakhil Commercial
Property LP, and Troy Allen McKenney; and (3) whether Mr. Della and his team took any CBB
property with them to Mission Bank, including, but not limited to, an excel spreadsheet of 665
Suncrest Bank PPP loan customers and a CBB Promotional Rate Report.

While I will address each of these issues in detail below, I want to begin by clearly and
categorically stating that Mr. Della and his team did not engage in conduct to sabotage CBB's
pending loan requests, have not used any of CBB's property (including any confidential or trade
secret information) to solicit CBB clients, and did not take any of CBB's property (including any
confidential or trade secret information) with them to Mission Bank.

As you and I have discussed, the latter two statements technically make it impossible for Mission
Bank to meet CBB's pre-suit demand set forth in the last paragraph of your May 17 email; after
all, Mr. Della and Mission Bank technically cannot "cease" what they have not been doing.
However, as you and I further discussed, I believe that semantics have unfortunately escalated
this dispute when it could have been resolved quickly by more straightforward dialogue. As
such, I want to also clearly and categorically confirm that Mr. Della and Mission Bank will not
use any of CBB's property (including confidential or trade secret information) to solicit CBB
clients going forward, both because they have no such property and because that is simply not
how Mission Bank or Mr. Della operate.

CBB-000140

CONFIDENTIAL

Christina N. Goodrich
June 7, 2022
Page 2

While the foregoing should be sufficient to satisfy CBB's concerns, in the spirit of transparency and to clear up any possible misunderstandings, I will also address each specific allegation in greater detail.

## Allegations of Sabotaging Loan Applications

On March 25, 2022, Richard Wohl, CBB's Executive Vice President and General Counsel, sent a letter to Mission Bank alleging that Mr. Della and his team cancelled pending title insurance requests for Pepita Real Estate LP ("Pepita") and then failed to reinitiate them. In its March 31, 2022 response letter, Mission Bank explained that letters of intent were issued, but that the individual at Chicago Title who was responsible for placing the title insurance left during the middle of the transaction to go to another title insurance company. Any delay was caused by this departure and not any action (or inaction) by Mr. Della and his team.

After Mr. Della's departure, it is our understanding that CBB assigned Loren Brooks as the loan officer to handle Pepita's loan request. Jeremey Commeret of Pepita then contacted Mr. Della at Mission Bank to complain that CBB had not yet finalized the loan. Mr. Della immediately called James Hall, a Center Manager at CBB, informed him of Pepita's concerns, and conveyed his reservations about whether Ms. Brooks would be able to handle Pepita's loan request. He also confirmed to Mr. Hall that he and Mission Bank did not want this loan and that it should be closed by CBB because it was already approved by CBB. He did, however, inform Mr. Hall that if CBB did not finalize the loan, he would handle it for Pepita. After this conversation, Mr. Della was not contacted again about the Pepita loan. It is Mission Bank's understanding that, regardless of any delay caused by the departure of the original title officer, Pepita's loan was closed and funded by CBB.

To be clear, Mr. Della and his team did not engage in any conduct or fail to take any actions that would sabotage Pepita's pending loan request with CBB, including not completing tasks by applicable deadlines, cancelling or failing to reorder title insurance, or attempting to process the loan for Mission Bank. Indeed, to the contrary, as soon as Mr. Della became aware that the loan had not yet closed, he affirmatively reached out to CBB—despite no longer being a CBB employee—to ensure that whatever issues were causing the delay were being remedied.

CBB's March 25, 2022 letter also alleges that Mr. Della and his team attempted to sabotage Citizens' relationship with YZAK Investments and Stor-it Palmdale. While CBB vaguely mentions that Mr. Della violated standard procedures that would cause the pending loans to not close within the timeframes needed to meet relevant transaction or escrow deadlines, CBB has not described any specific conduct that Mr. Della or his team allegedly did or did not do with regard to the YZAK Investments or Stor-it Palmdale loans. Nevertheless, Mr. Della and his team have confirmed that they did not engage in any conduct or fail to take any actions in order to sabotage these pending loan requests. In particular, Mr. Della and his team did not take actions to prevent the completion of tasks by applicable deadlines, cancel or fail to reorder title insurance, or attempt to process the loans for Mission Bank. If there are specific actions that CBB suspects were taken or not taken, Mission Bank is more than willing to address them. But as with the



**Larson LLP**
larsonllp.com

CONFIDENTIAL

Christina N. Goodrich
June 7, 2022
Page 3

Pepita loan, it is Mission Bank's understanding that both YZAK Investments' and Stor-it Palmdale's loans were closed and funded by CBB.

**Allegations of Solicitation**

CBB also alleges that Mr. Della and his team used CBB property to solicit the following CBB clients: CT Homes LLC, A&L Partida, Dakhil Commercial Property LP ("Dakhil"), and Troy Allen McKenney. Mr. Della and his team unequivocally deny soliciting these CBB clients.

As your client knows, CT Homes had a credit line with Suncrest Bank ("Suncrest") before it merged with CBB. Mr. Della was responsible for handling the renewal of CT Homes' credit line after the merger. However, CBB told Mr. Della that CT Homes would have to satisfy seven different conditions and changes in order to continue its credit line. Mr. Della warned CBB that CT Homes would not agree to that demand and that CT Homes would leave CBB. Despite this warning, CBB instructed Mr. Della to tell CT Homes—his best client—that they were not going to renew the line of credit unless CT Homes agreed to the seven conditions and changes. As predicted, CT Homes rejected the counter offer and thus, per standard industry practice, Mr. Della referred CT Homes to another bank: Bank of the Sierra. It was only after Bank of the Sierra decided not to work with CT Homes that Mr. Della then referred CT Homes to Mission Bank. In short, CT Homes' decision to work with Mission Bank resulted from CBB's decision not to renew CT Homes' credit line, and was *not* a result of Mr. Della soliciting CT Homes on behalf of Mission Bank.

CBB has also raised questions concerning the Ivanhoe and Hanford loans for A&L Partida. Mr. Della and his team did not solicit A&L Partida for these loans. Instead, after Mr. Della left CBB and joined Mission Bank, Jose Partida called Mr. Della and asked if he could handle the Ivanhoe commercial loan. Mr. Della informed Mr. Partida that his commercial loan was already approved by CBB and that CBB was positioned to finalize the loan, but that Mission Bank could handle the Ivanhoe commercial loan if that was what Mr. Partida wanted. Mr. Partida confirmed that he wanted Mission Bank to handle the loan, and so Mission Bank requested the appraisal for the subject property from CBB. Accordingly, because Mr. Partida first reached out to Mr. Della, Mr. Della and Mission Bank did not solicit A&L Partida—and certainly did not violate any contractual obligation or law. Thereafter, Mr. Della was informed by Mr. Partida, that CBB had renegotiated the loan with Mr. Partida and offered him much better terms. Upon learning of CBB's new terms, Mr. Della *encouraged* Mr. Partida to stay with CBB. It is Mission Bank's understanding that A&L Partida's Ivanhoe commercial loan was ultimately closed and financed by CBB. As for the Hanford loan, Mr. Della never even discussed it with Mr. Partida, let alone solicited A&L Partida's business in connection with that loan.

Turning to CBB's concerns about Dakhil, at the end of February, Mike Dakhil walked into CBB to discuss his CBB credit line. Mr. Dakhil's line of credit at CBB was up for maturity and Mr. Della was working on securing Mr. Dakhil an extension. Robert Morris, Senior Vice President of CBB, told Mr. Della that CBB was not going to renew the deal and directed Mr. Della to inform Mr. Dakhil of CBB's decision. Mr. Della did so. During that conversation, Mr. Dakhil asked Mr. Della if he was going to leave CBB. Mr. Della answered truthfully, confirming that he was. Mr.



**Larson LLP**
larsonllp.com

Dakhil then asked him where he was going, and Mr. Della truthfully stated that he would be joining Mission Bank. At that point, Mr. Dakhil asked if he could take his loan to Mission Bank. Mr. Della again answered truthfully, explaining that Mr. Dakhil could, if he chose, take his loan to Mission Bank; however, Mr. Della did not encourage or in any way attempt to convince Mr. Dakhil to do so. It was only when Mr. Dakhil indicated that he did, in fact, want to discuss his line of credit with Mission Bank that Mr. Della, *at Mr. Dakhil's request*, put him in contact with Mission Bank. On March 4, 2022, after being contacted by Mr. Dakhil, Mission Bank ordered an appraisal for the credit line's collateral property.

Once Mr. Della joined Mission Bank, because Mr. Dakhil had requested to take his loan to Mission Bank and had already been in discussions with Mission Bank, Mr. Della called Mr. Dakhil for financial information to continue the process. Thereafter, Mr. Dakhil informed Mr. Della that CBB had told him that he needed to pay the remaining balance of approximately $400,000 on his credit line. Apparently, when Mr. Dakhil went to CBB to discuss the payment and to inform CBB that Mission Bank was going to refinance his loan, CBB renegotiated the deal and Dakhil chose to stay at CBB. In sum, neither Mr. Della nor his team solicited Dakhil. Instead, Mr. Dakhil, on his own initiative, asked Mr. Della whether Mission Bank could take over his loan. Regardless, it is Mr. Della's and Mission Bank's understanding that Dakhil's credit line remains with CBB.

Finally, CBB has requested information about Troy McKenney, noting that he started a loan process with CBB, but alleging that the loan was then completed by Mission Bank two days after Mr. Della joined Mission Bank. Mr. McKenney did originally seek a loan from Suncrest Bank that related to a property that has a dry cleaner on it. CBB obviously became involved after the merger. CBB has a loan policy that requires properties with a dry cleaner to obtain a Phase 1 environmental report. Mr. McKenney informed Mr. Della that he did not want to spend the required $2,500 to obtain a Phase 1 report because he knew that CBB would then require him to get a Phase 2 report, which costs an additional $5,000. Ultimately, however, Mr. Della convinced Mr. McKenney to complete the Phase 1 report.

Upon receiving the report, and as Mr. McKenney had predicted, CBB required that Mr. McKenney complete a Phase 2 report. Mr. McKenney refused and CBB decided not to finance Mr. McKenney's loan. As a result, and per standard industry practice, Mr. Della referred Mr. McKenney to another bank: Mission Bank, which then completed the loan without requiring a Phase 1 or Phase 2 report. Mr. McKenney, who paid for the appraisal and Phase 1 report and who had received a copy of both, provided Mission Bank with these documents. Mission Bank did not rely on any CBB data to finalize the loan. In short, Mr. Della did not solicit Mr. McKenney for Mission Bank, but rather referred Mr. McKenney to Mission Bank after CBB declined to finance Mr. McKenney's loan.

Finally, as your client knows, Mr. McKenney is a real estate broker and agent with his own property listings. Since Mr. Della joined Mission Bank, Mr. McKenney has contacted Mr. Della 4-5 times asking whether Mission Bank can help finance Mr. McKenney's clients to purchase his listed properties. Those contacts have been initiated by Mr. McKenney; Mr. Della and his team have *not* solicited Mr. McKenney.



**Larson LLP**
larsonllp.com

## Allegations Concerning CBB Property

CBB has also raised concerns that Mr. Della and his team took CBB property to Mission Bank. Mr. Della and his team unequivocally deny taking any CBB property including, but not limited to, electronic or printed copies of customer lists, account agreements, pricing lists, marketing materials, account applications, proposed loan terms, appraisals ordered while at CBB, or emails to their personal email accounts regarding CBB customers or targets. CBB has specifically raised concerns about an excel spreadsheet of 665 Suncrest Bank PPP loan customers that Mr. Della commissioned Annie Buchanan to create, and a CBB Promotional Rate Report that Katrina Puerner created for Mr. Della on February 11, 2022. Each is addressed below.

As discussed in Mission Bank's March 31, 2022 letter, as a result of COVID-19, the government passed the CARES Act and enacted the Paycheck Protection Program ("PPP"), which was designed to keep people employed. The government also enacted the Employee Retention Credit ("ERC"), which created a tax refund for employers who kept employees employed. At the time it was passed, an employer could apply for either the PPP or the ERC, but not both.

The CARES Act was later amended so that an employer could utilize both the PPP and the ERC. When Mr. Della learned about this development in January 2022, he commissioned Annie Buchanan to create a client list of all Suncrest clients who had a PPP loan so that he and the other Center Managers could contact the clients and tell them about the ERC opportunity. Mr. Della believed that doing so could potentially foster goodwill and help stem the exodus of Suncrest clients leaving CBB, which was occurring in droves following the merger. Although Mr. Della commissioned the list in mid-January, Ms. Buchannan did not complete the list until February 7, 2022. By then, Mr. Della did not have time to contact clients about the ERC and ultimately decided not to pursue the idea any further.

Mr. Della has confirmed that he only ever had an electronic copy of the PPP loan customer list, which was saved to CBB's internal cloud. Mr. Della did not keep a copy of the client list, he did not send it to his personal email, he did not give it to members of his team, and he does not recall ever having a physical copy. Furthermore, Mr. Della never sent a copy of the spreadsheet to anyone outside of CBB or to anyone who has since left CBB. The last time he saw the list was sometime in mid-February—which was before he had an offer from Mission Bank.

Turning to the Promotional Rate Report, Suncrest utilized such reports for 2-3 years before its merger with CBB. A Promotional Rate Report contained the names of clients who had received a different interest rate than Suncrest's typical rates. The report contained the client's name, their deposit amount, and the promotional interest rate. Because each promotional interest rate had an expiration date, when a client's promotional rate was set to expire, Mr. Della would review the Promotional Rate Report to evaluate whether Suncrest would keep the promotional rate, increase it, or decrease it.

After the merger, Mr. Della had the Promotional Rate Report created for 40 Suncrest clients on February 11, 2022 at the direction of Michael Stain, Senior Vice President for the Central Valley Region. CBB was planning to convert Suncrest's clients to CBB's system and interest rates over President's Day weekend. As part of that process, Mr. Stain told the Center Managers, including



Larson LLP
larsonllp.com

CBB-000144

Christina N. Goodrich
June 7, 2022
Page 6

Mr. Della, that they needed to contact their top depositors to inform them of the conversion and corresponding rate changes from Suncrest's rates to CBB's rates. Mr. Stain also instructed the Center Managers to tell the depositors that their rates would require a different approval process.

Mr. Della had the list created, called his clients, and informed them of the upcoming conversion and change in rates. Neither Mr. Della, nor his team, took the Promotional Rate Report with them when they left CBB. They also did not give the Promotional Rate Report to anyone outside of CBB. Mr. Della does not have a copy of this Promotional Rate Report and any physical copy in his possession would have gone into his shred bin while still employed at CBB. The last time he saw the Promotional Rate Report was sometime between February 11 and February 17, 2022.

CBB's final concern is whether Mr. Della used any personal email address, cloud accounts, or devices at CBB, and whether these accounts and devices have any CBB property. The only personal email address that Mr. Della had during his time at CBB is a personal yahoo.com email account. Mr. Della does not recall ever sending work emails to his yahoo account. Nevertheless, out of an abundance of caution, he has searched this account and has not discovered any CBB property. Mr. Della has no other personal cloud accounts or devices that he used for work at CBB or that contain CBB property.

**<u>Conclusion</u>**

The foregoing information should be more than enough to alleviate any of CBB's concerns and provide sufficient assurances to prevent any further threats of litigation. Mission Bank is confident that Mr. Della and his team have fully complied with all contractual and legal obligations in their transition from CBB, and that CBB's concerns and suspicions are based on misunderstandings stemming from a series of events for which CBB lacked context and a full factual explanation. We hope that the information above puts to rest any concern that Mr. Della or his team engaged in any misconduct and that CBB will recognize that Mr. Della, his team, and Mission Bank have handled the transition entirely consistent with industry standards and the law. Nevertheless, as I indicated in our last telephone conversation, I am available to discuss further if you have any additional questions.

Sincerely,

Jonathan E. Phillips



**LARSON**

Larson LLP
larsonllp.com